# EXHIBIT 4

**No. 23-970**

# In the Supreme Court of the United States

_____

NVIDIA CORP. and JENSEN HUANG,

*Petitioners,*

*v.*

E. OHMAN J:OR FONDER AB and STICHTING PENSIOENFONDS PGB,

*Respondents.*

_____

*ON PETITION FOR WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

_____

**BRIEF OF PROFESSOR JOSEPH A. GRUNDFEST AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER**

_____

CHRISTOPHER G. MICHEL
  *Counsel of Record*
CASEY J. ADAMS
BRENNA LEDVORA
ABRAHAM MOUSSAKO
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, N.W.
Suite 900
Washington, D.C. 20005
(202) 538-8308
christophermichel@
  quinnemanuel.com

*Counsel for Amicus Curiae*

EX 4

58

i

## QUESTIONS PRESENTED

1.    Whether plaintiffs seeking to allege scienter under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b), based on allegations about internal company documents must plead with particularity the contents of those documents.

2.    Whether plaintiffs can satisfy the PSLRA's falsity requirement by relying on an expert opinion to substitute for particularized allegations of fact.

EX 4

ii

# TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED ........................................ i

TABLE OF AUTHORITIES ...................................... iii

INTEREST OF AMICUS CURIAE ........................... 1

INTRODUCTION AND  SUMMARY OF ARGUMENT ...................................................... 2

ARGUMENT ............................................................. 4

I.    Quantitative Metrics Demonstrate That the Circuit Splits Identified by the Petition Are Highly Consequential ................. 4

    A.    Methods for Quantifying the Significance of Circuit Splits................. 5

    B.    Quantifying This Petition's Splits ........ 8

II.    The Ninth Circuit Erred ................................ 10

    A.    The Expert Report is Not a "Fact" ...................................................... 10

    B.    The Expert Report Does Not Support a "Strong Inference of Scienter".................................................. 14

    C.    The Expert Report is Not Pled "With Particularity" ............................. 17

    D.    These Errors Are Significant .............. 19

CONCLUSION ........................................................ 21

**EX 4**

iii

## TABLE OF AUTHORITIES

**Page**

### Cases

*Alexander v. Sandoval,*
532 U.S. 275 (2001)................................................. 19

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,*
28 F.4th 343 (2d Cir. 2022) .................................. 12

*In re Ashworth, Inc. Sec. Litig.,*
No. 99CV0121-L(JAH), 2001 WL 37119391 (S.D. Cal. Dec. 3, 2001) ........................ 12

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975)................................................ 19

*Boukadoum v. Acelyrin, Inc.,*
No. 2:23-cv-09672 (C.D. Cal. Mar. 26, 2024) ........................................................... 4, 13

*Cent. Bank of Denver v. First Interstate Bank of Denver,*
511 U.S. 164 (1994).............................................. 20

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993).............................................. 13

*DeMarco v. DepoTech Corp.,*
149 F. Supp. 2d 1212 (S.D. Cal. 2001)............................................................ 12, 13

**EX 4**

iv

*Egbert v. Boule,*
    596 U.S. 482 (2022) .............................................. 19

*Fin. Acquisition Partners LP v.
    Blackwell,*
    440 F.3d 278 (5th Cir. 2006) .......................... 12, 13

*Halliburton Co. v. Erica P. John Fund,
    Inc.,* 573 U.S. 258 (2014) ........................................ 1

*Janus Cap. Grp., Inc. v. First Derivative
    Traders,* 564 U.S. 135 (2011) ............................... 19

*Lerner v. Northwest Biotherapeutics,*
    273 F. Supp. 3d 573 (D. Md. 2017) ...................... 12

*Merrill Lynch, Pierce, Fenner & Smith
    Inc. v. Dabit,* 547 U.S. 71 (2006) .............. 13, 19–20

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) .................................. 20

*Ong v. Chipotle Mex. Grill, Inc.,*
    294 F. Supp. 3d 199 (S.D.N.Y. 2018) .................. 12

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ................................ 20

*Slack Technologies, LLC v. Pirani,*
    598 U.S. 759 (2023) ................................................ 1

*Stoneridge Inv. Partners, LLC v. Sci.-
    Atlanta,* 552 U.S. 148 (2008) ............................... 19

*Tellabs, Inc. v. Makor Issues & Rts.,
    Ltd.,* 551 U.S. 308 (2007) .................... 4, 10, 14–20

**EX 4**

v

*In re Under Armour Sec. Litig.*,
   409 F. Supp. 3d 446 (D. Md. 2019) ...................... 12

### Statutes and Rules

15 U.S.C. § 78u-4(b) ..................................................... 2

15 U.S.C. § 78u-4(b)(2) .............................................. 10

15 U.S.C. § 78u-4(b)(1), (2)(A) ............................ 11, 17

Rule 10b-5 ............................................................ 6, 19

Sup. Ct. R. 10(a) ......................................................... 5

### Other Authorities

Andrew Gelman & Eric Loken, *The
   Statistical Crisis in Science*, *Science*,
   102 AMERICAN SCIENTIST 460 (2014)................... 15

Joseph A. Grundfest, *Quantifying the
   Significance of Circuit Splits in Peti-
   tions for Certiorari: The Case of Se-
   curities Fraud Litigation*, (Rock Cen-
   ter for Corporate Governance at
   Stanford University Working Paper,
   No. 254), https://pa-
   pers.ssrn.com/sol3/papers.cfm?ab-
   stract_id=4768231 .................................... 1–2, 5–7

Joseph A. Grundfest, *Disimplying Pri-
   vate Rights of Action Under the Fed-
   eral Securities Laws: Commission's
   Authority*, 107 HARV. L. REV. 961
   (1994) ................................................................ 19

**EX 4**

vi

Joseph P. Simmons, Leif D. Nelson &
    Uri Simonsoh, *False-Positive
    Psychology: Undisclosed Flexibility
    in Data Collection and Analysis
    Allows Presenting Anything as
    Significant*, 22(11) PSYCHOLOGICAL
    SCIENCE 1359 (2011) ........................................... 16

Raphael Silberzahn et al.,
    *Corrigendum: Many Analysts, One
    Data Set: Making Transparent How
    Variations in Analytic Choices Affect
    Results*, 1(4) ADVANCES IN METHODS
    AND PRACTICES IN PSYCHOLOGICAL
    SCIENCE 337 (2018) ........................................... 15

EX 4

1

## INTEREST OF AMICUS CURIAE[*]

Joseph A. Grundfest is the William A. Franke Professor of Law and Business (Emeritus) at Stanford Law School and a senior faculty member at the Rock Center on Corporate Governance. He was a Commissioner of the Securities and Exchange Commission from 1985 to 1990. Professor Grundfest has taught securities law for decades, published extensively on the subject in leading law reviews (including the Harvard, Yale, and Stanford Law Reviews), and submitted amicus briefs to this Court in significant securities cases, such as *Slack Technologies, LLC v. Pirani*, 598 U.S. 759 (2023), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014).

Professor Grundfest also authored a recent working paper, *Quantifying the Significance of Circuit Splits in Petitions for Certiorari: The Case of Securities Fraud Litigation* (Rock Center for Corporate Governance at Stanford University Working Paper, No. 254), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4768231 (hereinafter "Grundfest"), proposing new metrics for assessing the significance of circuit splits in securities fraud litigation. These metrics are directly applicable to this case. Professor Grundfest accordingly has a strong interest in the Court's

---

[*] Amicus affirms that no counsel for a party authored this brief in whole or in part, and no one other than amicus or his counsel made a monetary contribution intended to fund the preparation or submission of the brief. Counsel of record for all parties received notice at least 10 days prior to the due date of the intention of amicus to file this brief.

**EX 4**

65

2

consideration of the petition, which he submits should be granted.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

The petition for certiorari in this case presents important questions of both methodology and substance. The methodology addresses the commonly occurring question of how the Court should analyze the assertion of a conflict among federal courts of appeals (*i.e.*, a "circuit split"). Here, petitioners identify two related circuit splits regarding the proper interpretation of the pleading standards in the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b).

Litigants typically approach the analysis of a circuit split as a matter of simple "nose counting" (*e.g.*, asking how many circuits are on each side of the asserted split). However, as detailed by amicus in a recently released paper, *see* Grundfest, *supra*, reliable databases describing securities fraud litigation enable a calculation of the relative significance of each circuit in the overall market for class action securities fraud litigation. That calculation in turn enables a more refined approach to determining whether an asserted circuit split warrants this Court's review.

Specifically, amicus proposes two metrics that help inform a petitioner's claim to space on this Court's docket. First, the Court can examine the aggregate share of the overall market implicated by the conflict; a split between circuits accounting for only 5% of the total market is self-evidently less important than a split between circuits accounting for 50% of the market. Second, the Court can examine the relative

**EX 4**

3

share of the market on each side of the conflict. A split is worthier of review if the circuits on each side account for roughly equal shares, as opposed to lopsided shares in which one side might be dismissed as a relatively insignificant outlier.

Applying these metrics to securities fraud litigation yields a powerful insight, likely consistent with the Court's intuition and experience: a circuit split that includes the Second Circuit (accounting for 37% of the market) on one side, and the Ninth Circuit (accounting for 23% of the market) on the other side, is far more likely to be worthy of this Court's review than a split involving any other configuration of circuits.

The two questions presented implicate circuit splits fitting that description. The first question involves a total market share of 86% (with the First and Ninth Circuits accounting for 25% of the total market on one side and the Second, Third, Fifth, Seventh, and Tenth Circuits accounting for 61% on the other side).

The second question involves a total market share of 64% (with the Ninth Circuit accounting for 23% of the total market share on one side and the Second and Fifth Circuits accounting for 41% of the total market share on the other side).

The questions are additionally "certworthy" because the Ninth Circuit's decision is legally wrong, and badly so. As this Court has long recognized, implied private rights under federal securities laws expose defendants to particularly vexatious forms of litigation. Accordingly, Congress enacted the PSLRA to impose stringent pleading requirements on private securities plaintiffs and to reduce the probability that

**EX 4**

67

4

meritless claims proceed past the pleading stage. But the Ninth Circuit ignored both the statutory text and purpose of the PSLRA by allowing paid expert opinion testimony to support allegations of securities fraud.

As elaborated further by the petition and the dissent below, the Ninth Circuit's holding defies the PSLRA in at least three ways: it allows plaintiffs to plead opinions masquerading as facts; it circumvents the requirement to negate other equally compelling inferences of scienter; and it undermines the requirement to plead claims with particularity. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313–14 (2007); *id.* at 334 (Alito, J., concurring).

If this decision stands, it will amplify the kind of vexatious litigation that Congress intended the PSLRA to constrain. Indeed, a new securities fraud complaint relying on an expert opinion was filed just last week in the Ninth Circuit, in the wake of the misguided decision below. Am. Compl. at ¶¶ 66–67, 261–262, *Boukadoum v. Acelyrin, Inc.*, No. 2:23-cv-09672 (C.D. Cal. March 26, 2024). This is a paradigmatic case for this Court's review, and the petition should be granted.

## ARGUMENT

### I.  Quantitative Metrics Demonstrate That the Circuit Splits Identified by the Petition Are Highly Consequential

The petition presents two questions for consideration. The metrics identified in amicus's recent paper demonstrate that the circuit splits are highly consequential in the area of private securities litigation and are worthy of this Court's review.

**EX 4**

5

### A. Methods for Quantifying the Significance of Circuit Splits

The existence of a circuit split is one of the most important factors influencing the grant of certiorari. Sup. Ct. R. 10(a); *see* Grundfest, *supra*, at 12–13. But not all circuit splits are created equal. Some involve circuits that resolve a very large percentage of litigation that raises the question presented for this Court's review. Other splits engage circuits that only rarely address the question presented. The most common method of describing the significance of circuit splits before this Court is to simply count the number of circuits that split, regardless of how often (or seldom) those circuits confront the underlying question.

Consider a hypothetical split among four circuits. If each circuit's geography generates only 1% of the litigation implicated by the question presented, then resolving that question for these four circuits affects only 4% of the market. But if each circuit generates 20% of the litigation implicated by the question presented, then resolving the identical question for these circuits affects 80% of the market. All else being equal, a split implicating 80% of the market is more worthy of this Court's attention than an identical split implicating just 4% of the market.

Amicus has recently developed novel techniques for quantifying the economic significance of circuit splits with greater precision than simple "nose counting." *See* Grundfest, *supra*, at 4–5. As described below and elaborated further in amicus's paper, the quantitative significance of a circuit split can be expressed through two metrics.

EX 4

6

The first metric is the "aggregate circuit split share," which measures the total "market share" of all circuits that have split on either side of the question. It is here calculated by averaging several statistics quantifying the total number and value of federal class action securities fraud cases in the various circuits. These measures include the number of cases filed, the number of settlements reached, the total value of the settlements, more aggressive and conservative estimates of the plaintiffs' alleged damages, and mentions of key securities fraud legal terms (Rule 10b-5 and Section 11). The measures are then used to generate an equal-weighted average for each circuit.[1]

Significantly, the aggregate circuit split share metric confirms that the Second and Ninth Circuits dominate the market for class action securities fraud litigation.[2] Based on an equal-weighted average of all seven metrics, these two circuits alone represent approximately 60% of federal class action securities fraud litigation activity. The aggregate circuit split share of the remaining circuits is as follows: First Circuit (2%); Third Circuit (12%); Fourth Circuit (3%); Fifth Circuit (4%); Sixth Circuit (4%); Seventh Circuit

---

[1]    For more details on the calculation of these metrics, *see* Grundfest, *supra*, at 16–17.

[2]    *See* Grundfest, *supra*, at 23 for the full table of metrics. Because the metrics are very highly correlated, the use of an equal-weighted average does not bias the result. *See* Grundfest, *supra*, at 17.

**EX 4**

7

(5%); Eighth Circuit (2%); Tenth Circuit (3%); Eleventh Circuit (4%); D.C. Circuit (1%).[3]

The second metric is the "split ratio," which describes whether a split is caused by outlier circuits with relatively low aggregate circuit split shares, or whether the split instead reflects a disagreement among circuits with comparable circuit shares.

Consider a hypothetical split between two circuits in which the decision giving rise to the petition is from a circuit with 10% of the relevant market, while the circuit with an opposing view has a 40% share. The corresponding split ratio can be expressed as 10%–40%.[4] A split with that ratio is relatively lopsided, with the decision that gives rise to the petition representing a comparative outlier. By contrast, if the two circuits in that hypothetical split instead each had shares of 25%, the split ratio would be 25%–25%, illustrating an even division.

The takeaway from these two metrics is straightforward. All other factors equal, the Court should generally be more inclined to grant petitions that present splits with higher aggregate circuit split shares and relatively even split ratios. Those cases present

---

[3] *See* Grundfest, *supra*, at 23.

[4] This statistic can also be expressed as 20%–80%, where 20 is the percentage of the total market of cases represented by the opinion giving rise to the petition and circuits that agree with that opinion (10 / (10+40) = 0.20) and 80 is the percentage of the total market of cases represented by circuits with the opposing view (40 / (10+40) = 0.80). In the second expression, the values always sum to 100%. *See* Grundfest, *supra,* at 17, for a detailed discussion of this alternative calculation method.

EX 4

8

questions of broader national significance as to which the circuits are more evenly divided.[5]

### B.    Quantifying This Petition's Splits

The two questions presented here implicate circuit splits whose quantitative metrics suggest they are important and should be resolved by the Court.

The first question presented is "[w]hether plaintiffs seeking to allege scienter under the PSLRA based on allegations about internal company documents must plead with particularity the contents of those documents." Pet. at (i). This implicates a circuit split involving most federal class action securities fraud litigation. Five circuits hold that litigants seeking to plead scienter based on internal company documents must plead their contents with particularity. Those circuits, with their respective average shares, are the Second (37%), Third (12%), Fifth (4%), Seventh (5%), and Tenth (3%). In contrast, the First (2%) and Ninth (23%) Circuits hold that plaintiffs do not need particularized allegations about the documents' specific contents. *Id.* at 15–20.

---

[5]    The Court might be somewhat more likely to grant cert to resolve lopsided splits if the circuit on the "short" side of such a split is the one issuing the decision that gives rise to the petition. That is, the Court may prefer to review the decisions of outlier circuits when presented with such a decision, but may have less inclination to review the decisions of circuits on the "long" side of a split. While recognizing that this preference (and no doubt, many other nuances) may exist, the methodology described here does not attempt to expressly account for it.

EX 4

9

The aggregate circuit split share for the first question is thus 86%, the sum of the circuit shares on either side of the split. The split ratio is expressed either as 25%–61% or 29%–71%. The split is thus not driven by outlier circuits with *de minimis* shares of litigation on securities fraud. This split ratio and the high aggregate circuit split share present a powerful pragmatic argument for granting the petition as to the first question.

The second question presented is "[w]hether plaintiffs can satisfy the PSLRA's falsity requirement by relying on an expert opinion to substitute for particularized allegations of fact." *Id.* at (i). The decision below created this circuit split, which divides the Ninth Circuit (23%) on one side of the question, and the Second (37%) and Fifth (4%) Circuits on the other side. *Id.* at 27–28. The aggregate circuit split share here is 64%, and the split ratio is 23%–41% or 36%–64%.

Simply "nose counting" the number of split circuits understates the pragmatic significance of this split. While only three circuits are involved, compared to the seven affected by the first split, almost two-thirds of the market (64%) is engaged in this second split. As with the first question presented, the split is not caused by a rogue outlier with low market share, but rather is between the Second and Ninth Circuits, the circuits most important to the resolution of federal class action securities fraud claims.

In sum, both questions implicate circuit divisions with high aggregate circuit split shares: 86% for the first question and 64% for the second. The split ratios in both instances confirm that the split is not caused by rogue circuits with small shares. Both splits also

**EX 4**

73

10

divide the Second and Ninth Circuits, which are the most important circuits when litigating class action securities fraud claims.  These quantitative metrics strongly support granting the petition as to both questions.[6]

## II.  The Ninth Circuit Erred

In addition to implicating two consequential circuit splits, the decision below also commits (at least) three significant errors of law.  Under the PSLRA, a securities fraud complaint must "state with particularity [] the facts constituting the alleged violation" and the "'facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Tellabs,* 551 U.S. at 313–14 (quoting 15 U.S.C. § 78u-4(b)(2)).  The PSLRA thus requires that allegations (1) are of facts, (2) support a strong inference of scienter, and (3) are pled with particularity.  The Ninth Circuit's decision ignores each of these requirements and, if allowed to stand, will eviscerate protections essential to the PSLRA's operation.

### A.  The Expert Report is Not a "Fact"

The Ninth Circuit errs in treating the plaintiffs' expert report—the Prysm Report—as a fact, when it is actually an opinion.  This report was prepared by a "consulting firm" retained by plaintiffs to offer specific numerical estimates of NVIDIA's crypto-related revenues, based on inferences and exogenous analysis.  Compl. ¶¶ 143, 147, 153, No. 18-cv-07669 (N.D. Cal.

---

[6]   Moreover, the circuits giving rise to the conflict are on the short end of the split, which may make review even more attractive to the Court.

11

May 13, 2020), ECF No. 149. This consulting firm never claims to have set foot within NVIDIA, to have had access to any non-public NVIDIA information, or to have first-hand knowledge of any facts related to NVIDIA at all. The report is a "*post hoc* analysis by … an outside expert that relied on generic market research and unreliable or undisclosed assumptions to reach its revenue estimates." *Ohman v. NVIDIA Corp.*, 81 F.4th 918, 947 (9th Cir. 2023) (Sanchez, J., dissenting). On its face, it is not a "fact" of the sort that the PSLRA requires to support of securities fraud. *See* 15 U.S.C. § 78u-4(b)(1), (2)(A) (the complaint must "state with particularity all *facts*" supporting the belief "why the statement is misleading" and "*facts* giving rise to a strong inference" of scienter) (emphasis added).

The expert report was nonetheless essential to the Ninth Circuit's conclusion that plaintiffs adequately alleged securities fraud. To support allegations of misrepresentation, the panel emphasized that the crypto-related revenues publicly announced by NVIDIA's CEO differed from the expert's opinion. *See Ohman*, 81 F.4th at 933–34. To support scienter allegations, the panel concluded that the CEO "would have known" about the revenue estimates later reached by the expert's *post-hoc* analysis. *See id.* at 940. While the panel purported to rely on other allegations in reaching its conclusion—another market analyst whose "assumptions" and "sources of information" were not described; generalized statements from employees; and broad market "events"—none of these sources provided the critical revenue estimates. *Id.* at 932, 954.

**EX 4**

75

12

No other circuit would have allowed these *post-hoc* revenue estimates by outsiders to plead securities fraud.[7] *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006)); *see also* Pet. at 27–28.  Many district courts, too, would have rejected plaintiffs' claims.  *See, e.g.*, *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 454–55 (D. Md. 2019) ("Expert opinions generated for purposes of supporting Plaintiffs' theories in a [securities fraud complaint] do not warrant the assumption of truth."); *Ong v. Chipotle Mex. Grill, Inc.*, 294 F. Supp. 3d 199, 222 (S.D.N.Y. 2018) (refusing to consider "any conclusory allegations in the [securities fraud complaint] that are based on the [expert opinion]").[8]

It is not even clear that any court would admit the plaintiffs' expert report at a later stage of litigation. The complaint nowhere alleges that the report's methodology has any analogue in the peer reviewed literature, never describes the authors' qualifications beyond holding PhDs, and does not suggest that the

---

[7] Even the First Circuit, which aligns with the Ninth Circuit in allowing nonparticularized descriptions of internal corporate documents to support scienter, did not rely on this type of outside expert opinion to establish what those documents purportedly contained. *See In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 206–11 (1st Cir. 2005); *see also* Pet. at 22–23.

[8] *See also Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 590 (D. Md. 2017); *In re Ashworth, Inc. Sec. Litig.*, No. 99CV0121-L(JAH), 2001 WL 37119391, at *3 (S.D. Cal. Dec. 3, 2001); *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1222 (S.D. Cal. 2001).

**EX 4**

13

authors have published any research in peer-reviewed journals that is rationally related to the expert report's analysis. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592–93 (1993).

Thus, the panel not only accepted opinion evidence as fact, but it accepted potentially *inadmissible* opinion evidence as fact. These evidentiary complications are exactly why courts have refused to allow such opinions to masquerade as facts in order to satisfy the PSLRA's pleading standards. *See, e.g.*, *Blackwell*, 440 F.3d at 285–86 ("[A]llowing plaintiffs to rely on an expert's opinion in order to state securities claims requires a court to 'confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage'…. [and] might require ruling on the expert's qualifications." (quoting *DeMarco*, 149 F. Supp. 2d at 1221)).

The Ninth Circuit's decision to accept paid opinion evidence as fact conflicts with the PSLRA's express goal of combating abusive securities lawsuits. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006). The decision below will invite a flood of complaints that rely on paid outside experts to craft *post-hoc* analyses, with no grounding in first-hand knowledge, alleging corporate insiders must have known the facts that the experts think they should have known. In a recent example, plaintiffs cited an expert report to support allegations of fraud and scienter. *See supra* Am. Compl. at ¶¶ 66–67, 261–262, *Boukadoum v. Acelyrin, Inc.* (No. 2:23-cv-09672). As we are already seeing, well-resourced plaintiffs will be able to buy their way out of the PLSRA's pleading requirements. This is assuredly not what Congress intended when drafting the PLSRA.

**EX 4**

14

### B.   The Expert Report Does Not Support a "Strong Inference of Scienter"

The Ninth Circuit errs again in finding that this expert opinion supports a "strong inference" of scienter.  *Tellabs* holds that, when assessing whether a complaint adequately alleges a "strong inference," courts "must engage in a comparative evaluation," and consider "competing inferences rationally drawn from the facts alleged."  551 U.S. at 314.  A plaintiff satisfies the PSLRA's "[e]xacting pleading requirements" only if the inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 313, 324.  Despite relying on an expert opinion to find scienter, *see Ohman*, 81 F.4th at 940, the decision below never engages in *Tellabs*' comparative evaluation by asking whether other revenue estimates would be "as compelling" as those offered by that expert.  551 U.S. at 314.

Nor was it even possible for the Ninth Circuit to engage in this comparative analysis.  The complaint below asserts that the expert report's approach was "conservative," that its "third party data sources" were "credible," and that its analysis was "rigorous."[9]  Compl. ¶¶ 147–152c.  But *Tellabs* never concludes it is sufficient that a complaint is conservative, credible, rigorous, or any other synonym for "plausible."  The

---

[9]   As discussed below, these allegations do not describe the expert's analysis with sufficient particularity to conclude that it was, in fact, conservative, credible, or rigorous.  *See infra* at 17–18.

**EX 4**

78

15

requirement is, instead, far more exacting. The plaintiff's inference of fraud must be "at least as cogent" as any other possible inference. *Tellabs*, 551 U.S. at 314. But the complaint below never supports any inference that the expert's sources are more credible than other sources, or that its methodologies are superior to other methodologies that also generate revenue estimates. The complaint therefore cannot allege that the expert's conclusion is "at least as compelling as any opposing inference" because it never addresses any opposing inferences.

The complaint's silence on this point implicates a larger analytic issue now attracting attention among statisticians: the problem raised by the "garden of forking paths." *See, e.g.*, Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 AMERICAN SCIENTIST 460 (2014). When testing a hypothesis—such as whether NVIDIA's crypto-related revenues were higher than represented—researchers make many decisions, including which datasets to use and which statistical techniques to apply. All of these choices can affect the ultimate conclusion. To illustrate, a recent study compared the conclusions of numerous research teams, who had "analyzed the same data set to answer the same research question," and found that there was no consensus in either the selection of statistical techniques or outcome. *See* Raphael Silberzahn et al., *Corrigendum: Many Analysts, One Data Set: Making Transparent How Variations in Analytic Choices Affect Results*, 1(4) ADVANCES IN METHODS AND PRACTICES IN PSYCHOLOGICAL SCIENCE 337, 338, 343–47 (2018); *see also* Gelman & Loken, *supra*,

EX 4

79

16

at 464 (suggesting that "choices in analysis and interpretation are data dependent and would have been different given other possible data").

Moreover, researchers (consciously or unconsciously) tend to make analytic decisions that will support their desired result. *See* Joseph P. Simmons, Leif D. Nelson & Uri Simonsoh, *False-Positive Psychology: Undisclosed Flexibility in Data Collection and Analysis Allows Presenting Anything as Significant*, 22(11) PSYCHOLOGICAL SCIENCE 1359, 1360 (2011). This problem is amplified if researchers are compensated and know that their work has value to a paying client only if it supports a client's desired conclusion.

To make the problem concrete in the context of this case, assume that there are ten different credible databases and that there are ten different methodologies that can be used to estimate the effects of crypto-mining demand. For simplicity, assume that the combination of these ten databases and ten methodologies yields the possibility of one hundred different forms of analysis—ten different analyses of ten different databases. Assume further that the plaintiffs' expert report is a legitimate analysis of one of these one hundred possibilities. It is, as statisticians would say, one path in a garden of forking paths. But what of the other 99 paths that other equally competent analysts might have followed? *Tellabs* commands analysis of this broader question, but plaintiffs fail to even recognize the challenge.

Thus, even if the expert report is credible, that is not enough. The complaint pleads no facts suggesting

**EX 4**

80

17

that the report's analysis is at least as credible as opposing conclusions that can be reached by other experts addressing the same question.

## C. The Expert Report is Not Pled "With Particularity"

The Ninth Circuit's third error is that it ignores the PSLRA's "particularity" requirement, 15 U.S.C. § 78u-4(b)(1), (2)(A). This error demonstrates the prescience of Justice Alito's concurrence in *Tellabs*. Justice Alito explains that the plain language of the PSLRA requires that "a strong inference" must arise only from facts stated "with particularity." *Tellabs*, 551 U.S. at 334 (Alito, J., concurring). "It follows that facts not stated with the requisite particularity cannot be considered in determining whether the strong-inference test is met." *Id.*

Justice Alito's concern is motivated by dicta in the majority opinion stating that "'omissions and ambiguities' merely 'count against' inferring scienter, and that a court should consider all allegations of scienter, even nonparticularized ones, when considering whether a complaint meets the 'strong inference' requirement." *Id.* This interpretation, as Justice Alito emphasizes, would "undermine[] the particularity requirement's purpose of preventing a plaintiff from using vague or general allegations in order to get by a motion to dismiss." *Id.* Justice Alito thus cautions against holistic forms of analysis that consider a combination of factors, some or all of which are not pled with sufficient particularity, as evidence supporting a strong inference of scienter.

But that is precisely the form of analysis that dominates the opinion below. Even though the expert

**EX 4**

18

opinion was the only source of the critical revenue estimates relied upon by the Ninth Circuit, the complaint "fail[ed] to describe [the expert]'s assumptions and analysis with sufficient particularity to establish a probability that its [revenue] conclusions are reliable." *Ohman*, 81 F.4th at 953 (Sanchez, J., dissenting) (citation omitted); *see also* Pet. at 29–30 (describing the expert's questionable assumptions). Among other flaws, the complaint failed to describe the "proprietary analytic models" used to estimate NVIDIA's market share, which was one step in the expert's ultimate revenue estimate. *Id.* at 953–54. "[W]ithout knowing the basis for this input, one cannot ascertain the reliability of the output." *Id.* at 954.

But instead of excluding the expert opinion because of a lack of particularity, the panel leaned heavily on it. And, in an attempt to bolster the defectively pled expert report, the Ninth Circuit pointed to other generalized allegations—none of which confirmed the expert's specific revenue estimates. *See Ohman*, 81 F.4th at 932. Thus, rather than relying on particularized allegations, the Ninth Circuit relied on a combination of "vague or general allegations." *Tellabs*, 551 U.S. at 334 (Alito, J., concurring), and thereby "stripped [the particularity requirement] of all meaning." *Id.* This decision will permit plaintiffs to "circumvent" the PSLRA's "important" protections against abusive litigation—just as Justice Alito predicted seventeen years ago. *Id.* This Court's review is warranted to clarify this critically important point in private securities litigation.

**EX 4**

82

19

### D.   These Errors Are Significant

The Ninth Circuit's errors, if uncorrected, have the potential to dramatically expand private securities litigation.  The private right of action for securities fraud, arising under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, is implied, not express.  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011); *see also* Joseph A. Grundfest, *Disimplying Private Rights of Action Under the Federal Securities Laws: The Commission's Authority*, 107 HARV. L. REV. 961, 985–94 (1994).  As this Court has frequently held, such an implied right must be given "narrow scope." *Janus*, 564 U.S. at 145; *see, e.g.*, *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008) ("Concerns with the judicial creation of a private cause of action caution against its expansion."); *see also Egbert v. Boule*, 596 U.S. 482, 503 (2022) (Gorsuch, J., concurring) ("To create a new cause of action is … a power that is in every meaningful sense an act of legislation….  It has no place in federal courts charged with deciding cases and controversies under existing law."); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("private rights of action to enforce federal law must be created by Congress").

A narrow construction is particularly warranted here because private securities litigation "presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Dabit*, 547 U.S. at 81 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975)); *see, e.g.*, *Tellabs*, 551 U.S. at 313 ("Private securities fraud actions, however, if not adequately contained, can be employed abusively to impose substan-

**EX 4**

83

20

tial costs on companies and individuals whose conduct conforms to the law."); *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 189 (1994) ("Litigation under 10b–5 thus requires secondary actors to expend large sums even for pretrial defense and the negotiation of settlements.").

The PSLRA was enacted expressly to respond to this problem. The PSLRA's novel and stringent pleading requirements were specifically designed to reduce the probability that low-quality allegations would support meritless federal securities law claims. *See Dabit*, 547 U.S. at 81 (noting the PSLRA was "targeted at perceived abuses of the class-action vehicle" in securities litigation, including "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests," and "extortionate settlements"); *see also Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (the PSLRA was "motivated in large part by a perceived need to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries"); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999) ("Congress enacted the PSLRA to put an end to the practice of pleading fraud by hindsight.") (quotation marks and citation omitted).

But here, the Ninth Circuit ignores these pleading requirements, contravening the PSLRA's text and purpose. Allowing expert opinion testimony to masquerade as fact, while avoiding the comparative analysis commanded by *Tellabs* and evading the statute's particularity requirement, will expand, not narrow, the scope of an implied private right of action, while

**EX 4**

21

encouraging abusive litigation of the kind that the PSLRA was enacted to limit.

## CONCLUSION

The Court should grant the petition for certiorari.

Respectfully submitted.

CHRISTOPHER G. MICHEL
  *Counsel of Record*
CASEY J. ADAMS
BRENNA LEDVORA
ABRAHAM MOUSSAKO
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, N.W.
Suite 900
Washington, D.C. 20005
(202) 538-8308
christophermichel@
  quinnemanuel.com

*Counsel for Amicus Curiae*

April 4, 2024

**EX 4**

85