# EXHIBIT 5

No. 23-970

# In the Supreme Court of the United States

NVIDIA CORPORATION, et al., PETITIONERS

*v.*

E. OHMAN J:OR FONDER AB, et al.

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

**BRIEF FOR FORMER SEC OFFICIALS**
**AS AMICI CURIAE SUPPORTING PETITIONERS**

CONNIE L. WANG
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA  94301
(650) 461-5600

MORGAN L. RATNER
    *Counsel of Record*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC  20006
(202) 956-7522
ratnerm@sullcrom.com

EX 5

## TABLE OF CONTENTS

Page

Interest Of Amici Curiae......................................................1

Introduction And Summary Of Argument........................4

Argument................................................................................7

I.   Scienter Is A Critical Independent Element
     Of A Section 10(b) Claim..............................................7

     A. This Court Long Ago Recognized That
        Scienter Is An Essential Element Of Section
        10(b) Claims .............................................................7

     B. The PSLRA Ratcheted Up The Scienter
        Requirement For Section 10(b) Claims ..............10

     C. The Scienter Requirement Remains A
        Critical Check On Section 10(b) Claims.............13

II.  The Decision Below Undermines  Section 10(b)'s
     Scienter Requirement .................................................17

     A. The Ninth Circuit's Approach Conflates
        Scienter With Falsity............................................17

     B. The Facts Here Illustrate The Flaws In The
        Ninth Circuit's Approach .....................................20

Conclusion............................................................................23

(I)

**EX 5**

II

## TABLE OF AUTHORITIES

Page(s)

Cases:

*Aaron* v. *SEC*,
    446 U.S. 680 (1980) ....................................................10

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999) ......................................12

*Anderson* v. *Spirit Aerosystems Holdings, Inc.*,
    827 F.3d 1229 (10th Cir. 2016)...........................18-20

*Blue Chip Stamps* v. *Manor Drug Stores*,
    421 U.S. 723 (1975) ....................................7, 8, 14, 16

*Bryant* v. *Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999)................................13

*In re Comshare, Inc. Sec. Litig.*,
    183 F.3d 542 (6th Cir. 1999)..............................12, 13

*Ernst & Ernst* v. *Hochfelder*,
    425 U.S. 185 (1976) .................... 4, 5, 8-10, 13, 15-16

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994)....................................13

*Greebel* v. *FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ....................................12

*Hevesi* v. *Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) .......................................16

*Janus Cap. Grp., Inc.* v. *First Derivative Traders*,
    564 U.S. 135 (2011) ..................................................14

*Meitav Dash Provident Funds & Pension Ltd.* v.
    *Spirit AeroSystems Holdings, Inc.*,
    79 F.4th 1209 (10th Cir. 2023) ...............................18

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v.
    *Dabit*, 547 U.S. 71 (2006) ..................................10, 11

**EX 5**

III

Cases—Continued:

*Santa Fe Indus., Inc.* v. *Green,*
430 U.S. 462 (1977) ...................................................8

*In re Scholastic Corp. Sec. Litig.,*
252 F.3d 63 (2d Cir. 2001) .......................................18

*In re Silicon Graphics Inc. Sec. Litig.,*
183 F.3d 970 (9th Cir. 1999)....................................13

*Slack Techs., LLC* v. *Pirani,*
598 U.S. 759 (2023) .................................................15

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.,* 552 U.S. 148 (2008) .......................7, 14

*Superintendent of Ins.* v. *Bankers Life & Cas. Co.,*
404 U.S. 6 (1971) ................................................13, 14

*Tellabs, Inc.,* v. *Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ..................................5, 10-12, 19

*Touche Ross & Co.* v. *Redington,*
442 U.S. 560 (1979) .................................................14

Statutes:

15 U.S.C. § 77k(a) .......................................................15
15 U.S.C. § 77k(e) .......................................................15
15 U.S.C. § 77*l*(a)(2)..................................................15
15 U.S.C. § 77m..........................................................15
15 U.S.C. § 77q(a)(2)...................................................15
15 U.S.C. § 78j(b) ..............................................8, 14, 15
15 U.S.C. § 78u-4(b)(2) ..........................................5, 11

Regulations:

17 C.F.R. § 240.10b-5...................................................8
17 C.F.R. § 240.10b-5(b)..............................................15

Legislative Materials:

H.R. Conf. Rep. No. 369, 104th Cong. (1995) ......10, 11
S. Rep. No. 98, 104th Cong. (1995)........................10, 11

**EX 5**

IV

Rule:

Federal R. Civ. P. 9(b) ............................................5, 11

Other Authorities:

4 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* (Nov. 2023 update)..............15, 16

Richard A. Booth, *Deconstructing Scienter*, 16 Va. L. & Bus. Rev. 1 (2021) ...............................12, 14, 15

Cornerstone Research, *Securities Class Action Settlements: 2023 Review and Analysis* (2024) ...16

Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (2024)................................14

Bruce Cannon Gibney, *The End of the Unbearable Lightness of Pleading: Scienter After* Silicon Graphics, 48 UCLA L. Rev. 973 (2001).................13

John L. Latham & Jenna L. Fruechtenicht, *Securities Regulation*, 48 Mercer L. Rev. 1677 (1997).....................................................................12

Eugene Zelensky, *New Bully on the Class Action Block—Analysis of Restrictions on Securities Class Actions Imposed By the Private Securities Litigation Reform Act of 1995*, 73 Notre Dame L. Rev. 1135 (1998).......................................12

**INTEREST OF AMICI CURIAE**[1]

Amici are former Commissioners and senior officials of the U.S. Securities and Exchange Commission (SEC) who served in both Republican and Democratic administrations and are now leaders in industry and academia. Collectively, they have decades of experience in administering and enforcing the federal securities laws.

Stephanie Avakian is a former Director and Co-Director of the SEC's Division of Enforcement (2016-2020) and Partner and Chair of the Securities and Financial Services Department at Wilmer Cutler Pickering Hale and Dorr LLP. Before re-joining the SEC as Deputy Director of the Division of Enforcement in 2014, Ms. Avakian practiced securities law for almost two decades, representing financial institutions, public companies, boards, and individuals in matters before the SEC and other agencies, and, earlier in her career, held various other positions at the SEC.

Jay Clayton is a former Chairman of the SEC (2017-2020), Senior Policy Advisor and Of Counsel at Sullivan & Cromwell LLP, and Adjunct Professor at the University of Pennsylvania Carey Law School and Wharton School of Business. Before his Chairmanship, Mr. Clayton practiced securities and corporate law for more than two decades, advising issuers, underwriters, investors, and regulatory authorities on a wide variety

---

[1] No counsel for any party authored this brief in whole or in part, and no party or counsel made a monetary contribution to the preparation or submission of this brief. No person other than amici or their counsel made a monetary contribution to the preparation or submission of this brief. Consistent with Rule 37.2, all counsel of record received timely notice of amici's intent to file this brief.

(1)

**EX 5**

92

2

of securities offering, trading, and public-policy matters.

Meredith B. Cross is a former Director of the SEC's Division of Corporation Finance (2009-2013) and Partner in the Securities and Transactional Departments at Wilmer Cutler Pickering Hale and Dorr LLP. Earlier in her career, Ms. Cross served in a variety of positions in the Division of Corporation Finance at the SEC, including Deputy Director, Associate Director (International and Small Business), and Chief Counsel. She has advised on disclosure requirements and liability standards under the federal securities laws for over 30 years.

Christopher Cox is a former Chairman of the SEC (2005-2009). Before his Chairmanship, Mr. Cox served as a member of the U.S. House of Representatives for 17 years. He was the principal House author of the Private Securities Litigation Reform Act (PSLRA) and the House Chair of the conference committee on the legislation. Mr. Cox's experience prior to joining Congress included serving as Senior Associate Counsel to the President and practicing corporate law.

Daniel M. Gallagher is a former Commissioner of the SEC (2011-2015) and the Chief Legal, Compliance, and Corporate Affairs Officer of Robinhood Markets. Mr. Gallagher held several other positions at the SEC before being appointed Commissioner, including Deputy Director and co-Acting Director of the Division of Trading and Markets. Mr. Gallagher was also formerly a Partner and Deputy Chair of the Securities Department at Wilmer Cutler Pickering Hale and Dorr LLP.

William H. Hinman is a former Director of the SEC's Division of Corporation Finance (2017-2020), Senior Advisor at Simpson Thacher & Bartlett LLP, Advisory Partner to venture capital firm Andreessen Horowitz, and advisor to the American Law Institute's

EX 5

93

3

Restatement of the Law of Corporate Governance. Prior to joining the Commission, Mr. Hinman practiced law for over three decades, representing a wide range of clients in the fields of securities law and corporate governance.

Simon Lorne is a former General Counsel of the SEC (1993-1996), Senior Advisor at Millennium Management LLC, and Adjunct Professor of Law at the University of Texas at Austin School of Law. After his tenure at the Commission, Mr. Lorne held senior legal and compliance positions at Citicorp and its predecessor firms and practiced law with a focus on corporate governance, mergers and acquisitions, and corporate finance.

Troy A. Paredes is a former Commissioner of the SEC (2008-2013) and founder of Paredes Strategies LLC. In his current consulting practice, Mr. Paredes advises on financial regulation, compliance, risk management, corporate governance, and disputes involving securities law. Prior to joining the Commission, Mr. Paredes was a professor of law at Washington University in St. Louis. He has also been a Distinguished Scholar in Residence at NYU School of Law, a Distinguished Policy Fellow and Lecturer at the University of Pennsylvania Carey Law School, and a Lecturer on Law at Harvard Law School.

Elad Roisman is a former Commissioner (2018-2022) and Acting Chairman (2020) of the SEC and Partner at Cravath, Swaine & Moore LLP. Prior to joining the Commission, Mr. Roisman served as Chief Counsel to the U.S. Senate Committee on Banking, Housing, and Urban Affairs. Before working in the Senate, he served as Counsel to SEC Commissioner Daniel M. Gallagher, served as Chief Counsel at NYSE Euronext, and practiced corporate law.

EX 5

4

Laura S. Unger is a former Commissioner (1997-2002) and Acting Chairman (2001) of the SEC. Since leaving the SEC, Ms. Unger has served as an independent director on several public company boards, including for Nomura Holdings, Inc., Navient Corp., CIT Group, Ambac Financial Group, Inc., CA, Inc., MBNA Corp., and IQ Funds. Before being appointed to the Commission, Ms. Unger served as Securities Counsel to the U.S. Senate Committee on Banking, Housing and Urban Affairs (where she worked as Committee Counsel to the Chair on the PSLRA, among other legislation). Prior to working on Capitol Hill, Ms. Unger was an attorney with the Enforcement Division of the SEC.

Amici have a longstanding interest in the proper and consistent interpretation and enforcement of the federal securities laws. Given the SEC's limited resources, lawsuits initiated by private parties are an important complement to the agency's own enforcement actions. But it is vital to the integrity of the securities laws that private enforcement actions remain within proper bounds. When courts allow claims to proceed under securities laws targeting fraudulent conduct without requiring plaintiffs to plead the necessary *mens rea*, that undermines confidence in the legitimacy and fairness of securities enforcement writ large.[2]

### INTRODUCTION AND SUMMARY OF ARGUMENT

Nearly 50 years ago, this Court held that scienter is a required element of any securities-fraud claim brought under Section 10(b) of the Securities Exchange Act of 1934. *See Ernst & Ernst* v. *Hochfelder*,

---

[2] The views expressed in this brief do not necessarily reflect the views of the institutions with which amici are or have been affiliated.

**EX 5**

5

425 U.S. 185, 193 (1976). The Court defined scienter as an "intent to deceive, manipulate, or defraud." *Id.* Scienter, in short, separates the unwitting blunderer from the willing fraudster.

The bar for pleading scienter under Section 10(b) is high. Federal Rule of Civil Procedure 9(b) requires that any fraud be alleged with "particularity." But even that heightened standard is not enough in the Section 10(b) context. In the Private Securities Litigation Reform Act (PSLRA), Congress further required that a plaintiff bringing a Section 10(b) claim set forth particularized allegations giving rise to a "*strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). In *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), this Court reinforced that Congress meant what it said in the PSLRA: "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

Maintaining that rigorous scienter pleading requirement is important for several reasons. First, Section 10(b) is enforceable by private parties under a judicially inferred right of action that this Court has said must be construed narrowly. Second, Section 10(b) is one of the most commonly invoked and wide-ranging provisions of securities law, potentially encompassing any statement made in connection with the purchase or sale of any security. Third, scienter helps ensure that only those defendants with a culpable state of mind are subject to the high costs of defending against class-action Section 10(b) suits, and the prospect of hefty damages (or, more commonly, settlements) associated with such suits.

**EX 5**

6

In the decision below, the court of appeals stripped the scienter requirement of any significant force and eroded the PSLRA's heightened pleading standard. Under the Ninth Circuit's approach, a plaintiff can plead a Section 10(b) claim through a chain of speculative allegations and assumptions. First, to plead falsity, the plaintiff must identify public statements by an executive and then hire an expert to generate data—including estimates based on generic market research—that contradict the executive's public statements. After that, under the Ninth Circuit's check-the-box approach to pleading scienter, the plaintiff need only allege that the company maintained internal reports and that the defendant was a detail-oriented executive who had access to such internal reports. The plaintiff is then free to speculate that some hypothetical internal report *would have* reflected the same data as the plaintiff's expert report, and that the defendant executive *would have* reviewed that hypothetical internal report before making the challenged statements.

That chain of inferences does not rest on "particularized" allegations, nor does it raise a "strong inference" of scienter. Instead, the decision below undercuts what has been a fundamental pillar of a Section 10(b) claim for nearly half a century. And it provides a roadmap for future plaintiffs to survive the motion-to-dismiss stage without any evidence of culpable conduct. If allowed to stand, the decision below would revolutionize federal securities-fraud litigation—for the worse. This Court should grant review and reverse.

**EX 5**

97

7

### ARGUMENT

## I. SCIENTER IS A CRITICAL INDEPENDENT ELEMENT OF A SECTION 10(b) CLAIM.

Scienter is a well-established hurdle that Section 10(b) plaintiffs must clear. Fifty years ago, this Court first recognized that scienter is a distinct element of a Section 10(b) claim. Thirty years ago, Congress followed suit, subjecting scienter to particularly demanding pleading standards under the PSLRA. In the decades since, the scienter requirement has played a critical role in constraining an otherwise wide-ranging implied private right of action and in limiting liability to those with a culpable mental state.

### A. This Court Long Ago Recognized That Scienter Is An Essential Element Of Section 10(b) Claims.

A securities-fraud claim under Section 10(b) of the Securities Exchange Act of 1934, as implemented through SEC Rule 10b-5, consists of six discrete elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Those six elements are not all expressly listed in the statutory text. Rather, this Court has gleaned them over time from the Act's text, its structure, its legislative history, and consideration of "practical factors" like the "danger of vexatious litigation." *Blue Chip Stamps* v. *Manor*

**EX 5**

8

*Drug Stores*, 421 U.S. 723, 740, 749 (1975); *see Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 477-479 (1977).[3]

1. This Court first recognized scienter as one of those six elements in *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976). In *Hochfelder*, the Court began with the text of Section 10(b), which makes it unlawful to use "'any manipulative or deceptive device or contrivance' in contravention of Commission rules." *Id.* at 197. The Court observed that the words "'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that [Section] 10(b) was intended to proscribe knowing or intentional misconduct." *Id.* Congress's inclusion of the word "manipulative," the Court explained, was "especially significant," because it was "virtually a term of art" in the securities field and "connote[d] intentional or willful conduct designed to deceive or defraud investors." *Id.* at 199.

Although this Court concluded that the plain text of the statute was clear, it proceeded to analyze the legislative history and broader statutory scheme. The

---

[3]    Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security . . ., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) by making it unlawful:

  (a) To employ any device, scheme, or artifice to defraud,

  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or

  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

  in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

**EX 5**

9

Court found that they too supported a scienter requirement. *See Hochfelder*, 425 U.S. at 201-211. In describing the proposed legislation, the Senate and House Reports and one of the principal drafters had used language like "manipulative," "cunning," and "deceptive"— all terms that would be a poor fit for negligence. *Id.* at 202-206. "There [was] no indication" in the legislative record "that Congress intended anyone to be made liable for . . . practices [under Section 10(b)] unless he acted other than in good faith." *Id.* at 206.

This Court also rejected the argument that Section 10(b) focuses exclusively on "the 'effect' upon investors," which "is the same regardless of whether the conduct is negligent or intentional." *Hochfelder*, 425 U.S. at 198. The Court explained that the "logic of this effect-oriented approach would impose liability for wholly faultless conduct where such conduct results in harm to investors." *Id.* That result, the Court concluded, could not be squared with a statute that distinguishes between those who engage in intentional wrongdoing and those who simply make good-faith mistakes. *See id.* at 198-199.

Finally, the *Hochfelder* Court emphasized Section 10(b)'s distinct features and scope. The Court compared other provisions in the Securities Act of 1933 and the 1934 Act, where Congress had expressly provided that defendants could be liable for negligence. *See* 425 U.S. at 206-208. The Court observed that each of those provisions is subject to "significant procedural restrictions not applicable under [Section] 10(b)," such as the ability of a court to require that the plaintiff post a bond for costs (including attorneys' fees) and a one-year statute of limitations. *Id.* at 209-210. By contrast, Section 10(b) contains "no comparable restrictions,"

EX 5

10

which the Court viewed as a strong indication that Congress did not intend Section 10(b) to extend to "negligent wrongdoing." *Id.* at 210.

2. This Court reinforced the centrality of scienter to Section 10(b) in *Aaron* v. *SEC*, 446 U.S. 680 (1980). In *Aaron*, the Court confronted the question whether the scienter requirement applies not only to implied private actions for damages, but also to civil enforcement actions brought by the SEC to enjoin violations of Section 10(b). The Commission had argued that it need not prove scienter, emphasizing that the Court had reserved the question in *Hochfelder* and that the different purposes served by an agency-enforcement action warranted a different result. *See id.* at 685. The Court disagreed. It explained that the rationale of *Hochfelder* "ineluctably leads to the conclusion that scienter is an element of a violation of [Section] 10(b) and Rule 10b-5, regardless of the identity of the plaintiff or the nature of the relief sought." *Id.* at 691.

**B. The PSLRA Ratcheted Up The Scienter Requirement For Section 10(b) Claims.**

Two decades after *Hochfelder*, Congress enacted the PSLRA and imposed an even "stricter demand" on pleading scienter in the Section 10(b) context. *Tellabs*, 551 U.S. at 314. Congress designed the PSLRA to curtail abusive practices in private securities-fraud litigation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71, 81-82 (2006). Members of Congress were concerned about "the routine filing of lawsuits against issuers of securities and others whenever there [was] a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer." H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 31 (1995); *see* S. Rep. No. 98, 104th Cong., 1st Sess. 8 (1995) ("A complaint alleging violations of the

**EX 5**

101

11

Federal securities laws is easy to craft and can be filed with little or no due diligence."). Congress recognized that when "innocent" issuers are "forced to pay exorbitant 'settlements'" to terminate meritless litigation, "the issuer's own investors . . . are the ultimate losers." H.R. Conf. Rep. No. 369 at 32.

To "curb frivolous, lawyer-driven litigation" and to provide a measure of fairness to defendant companies, their executives, and their shareholders, Congress erected significant new safeguards. *Tellabs*, 551 U.S. at 322; *see Merrill Lynch*, 547 U.S. at 81-82. Most notably, it increased the already-elevated standard for pleading scienter. As a baseline, Federal Rule of Civil Procedure 9(b) requires plaintiffs alleging fraud to "state with particularity the circumstances constituting fraud." But before the PSLRA, "the courts of appeals ha[d] interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits." H.R. Conf. Rep. No. 369 at 41. Congress expressed concern that those differences had "creat[ed] substantial uncertainties and opportunities for abuses." S. Rep. No. 98 at 4.

In the PSLRA, Congress responded by enacting "uniform and more stringent pleading requirements" intended to set a high bar for Section 10(b) actions across the nation. H.R. Conf. Rep. No. 369 at 41; *see Tellabs*, 551 U.S. at 320. The PSLRA imposes, on top of Rule 9(b)'s baseline pleading standard for fraud, an additional requirement that plaintiffs bringing claims under Section 10(b) allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). As this Court later explained, it is no longer enough "that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state

EX 5

102

12

of mind." *Tellabs*, 551 U.S. at 314.  Rather, "[t]o qualify as 'strong'" within the meaning of the PSLRA, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

The PSLRA, and the change to the scienter pleading standard in particular, represented a significant shift in private securities litigation. *See* Eugene Zelensky, *New Bully on the Class Action Block—Analysis of Restrictions on Securities Class Actions Imposed By the Private Securities Litigation Reform Act of 1995*, 73 Notre Dame L. Rev. 1135, 1136 (1998) ("The PSLRA represents the first substantial reform of the federal securities laws since the sweeping New Deal legislation."); John L. Latham & Jenna L. Fruechtenicht, *Securities Regulation*, 48 Mercer L. Rev. 1677, 1678 (1997) ("As one of the most significant pieces of legislation enacted in the private securities area this half of the century, the PSLRA will substantially impact the manner in which the securities laws are litigated."); *see also* Richard A. Booth, *Deconstructing Scienter*, 16 Va. L. & Bus. Rev. 1, 27 (2021) ("[I]t is significant that," in the PSLRA, "Congress chose to focus on the element of scienter as a way to separate the meritorious wheat from the dismissible chaff.").  As this Court observed in *Tellabs*, "the 'strong inference' standard unequivocally raise[d] the bar for pleading scienter." 551 U.S. at 321 (citation omitted).

The courts of appeals promptly recognized that significant shift.  Many reevaluated and tightened their scienter-pleading regimes in the wake of the PSLRA. *See Greebel* v. *FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183

**EX 5**

103

13

F.3d 542 (6th Cir. 1999); *Bryant* v. *Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999); *see also* Bruce Cannon Gibney, *The End of the Unbearable Lightness of Pleading: Scienter After* Silicon Graphics, 48 UCLA L. Rev. 973, 982-986 (2001). That included the Ninth Circuit, which before the PSLRA had permitted plaintiffs to plead scienter generally. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994) (en banc). After the PSLRA's enactment, the Ninth Circuit corrected course and—until the decision below—embraced the PSLRA's changes. Based on a careful examination of the law's text and history, the court explained that "a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).

### C. The Scienter Requirement Remains A Critical Check On Section 10(b) Claims.

The demanding scienter pleading requirement recognized by this Court in *Hochfelder* and bolstered by Congress in the PSLRA remains critical today. Several features of Section 10(b) reinforce the continued need for caution before courts conclude that plaintiffs have satisfied that requirement.

1. First, Section 10(b) can be enforced through a private right of action that lacks textual constraints. Section 10(b) "does not by its terms create an express civil remedy for its violation, and there is no indication that Congress, or the Commission when adopting Rule 10b-5, contemplated such a remedy." *Hochfelder*, 425 U.S. at 196. Nevertheless, shortly after its passage, lower courts began reading a private cause of action into the statute, and in *Superintendent of Insurance* v.

**EX 5**

104

14

*Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n.9 (1971), this Court "acquiesced" in those decisions. *Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 577 n.19 (1979). Because the private Section 10(b) action is a judicial inference, courts have been left to elaborate its elements and delineate its boundaries. *See Blue Chip Stamps*, 421 U.S. at 737 ("When we deal with private actions under Rule 10b-5, we deal with a judicial oak which has grown from little more than a legislative acorn.").

As part of that project, this Court has been vigilant in imposing reasonable limits on Section 10(b) claims, including via the scienter requirement. The Court has required that "a right of action Congress did not authorize when it first enacted the statute" be given "narrow dimensions." *Stoneridge*, 552 U.S. at 167. And it has cautioned that "[c]oncerns with judicial creation of a private cause of action caution against its *expansion*," too. *Id.* at 165 (emphasis added); *see Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011). Loosening the scienter requirement would have the effect of vastly expanding the judicially inferred private cause of action under Section 10(b), contrary to this Court's admonition.

2. Second, Section 10(b) is already one of the most frequently invoked and far-reaching provisions of federal securities law. Out of 228 federal securities filings in 2023, 197 (or 86%) involved Rule 10b-5 claims. *See* Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* 2-3 (2024). That is presumably because Section 10(b), as implemented through Rule 10b-5, sweeps broadly: it applies any time an individual makes a material false statement or omission "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); *see* 17 C.F.R. § 240.10b-5(b); Booth, *supra*, at

**EX 5**

105

15

4 (Rule 10b-5 is a "catch-all antifraud rule" that "outlaws all forms of fraud in connection with the purchase or sale of securities in interstate commerce").

As this Court noted in *Hochfelder*, other securities laws that do not require proof of scienter are far narrower. Many are subject to procedural limits not found in Section 10(b). *See Hochfelder*, 425 U.S. at 210; *see also, e.g.*, 15 U.S.C. § 77k(e) (authorizing courts to require plaintiffs bringing actions under Sections 11 and 12(a)(2) to post a bond for costs, including attorneys' fees); *id.* § 77m (imposing a one-year statute of limitations for the same actions). They are also cabined to more limited classes of documents, defendants, or wrongful activities. For instance, Section 11 requires only negligence, but Section 11 claims are limited to misstatements in a single document—the registration statement—filed only when a company issues new securities. *See* 15 U.S.C. § 77k(a); *see also Slack Techs., LLC* v. *Pirani*, 598 U.S. 759, 762-763 (2023). Section 12(a)(2) likewise does not require scienter, but it has a strict privity requirement making it generally unsuitable for class actions: a plaintiff can sue only the person from whom the plaintiff purchased the security. 15 U.S.C. § 77*l*(a)(2). And under Section 17(a)(2), the SEC can sue for negligent violations, but only when defendants use a misleading statement or omission "to obtain money or property." *Id.* § 77q(a)(2).

3. Third, Section 10(b) claims threaten onerous liability and money damages—and impose high costs even to sustain a defense. Such claims are generally brought as class actions, and the standard measure of damages is the out-of-pocket losses of all the class members. *See* 4 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12:98 & n.1 (Nov. 2023

**EX 5**

16

update). Researchers estimate that in 2023 the average asserted shareholder loss in Section 10(b) cases was $2.47 billion. *See* Cornerstone Research, *Securities Class Action Settlements: 2023 Review and Analysis* 5 (2024). Indeed, that is why most of these claims settle. Securities class actions place "hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability." *Hevesi* v. *Citigroup Inc.*, 366 F.3d 70, 81 (2d Cir. 2004) (citation omitted). The costs of defending against a Section 10(b) claim—including diversion of company resources, burdensome discovery, and the hiring of experts—are likewise potentially exorbitant and contribute to the pressure to settle. *See Blue Chip Stamps*, 421 U.S. at 742-743 ("[T]he mere existence of an unresolved lawsuit has settlement value to the plaintiff . . . because of the threat of extensive discovery and disruption of normal business activities which may accompany a lawsuit which is groundless in any event."). And it is "[t]he shareholders of the defendant corporations" who "ultimately bear the burden" of "large damage claims, costly litigation, [and] generous settlements to avoid such cost." *Id.* at 761 n.5 (Powell, J., concurring).

The scienter pleading requirement works to ensure that only those companies whose executives are truly culpable—that is, who act with an "intent to deceive, manipulate, or defraud," *Hochfelder*, 425 U.S. at 193—are forced to incur massive litigation costs and the risk of crushing liability associated with securities class actions. From a prosecutorial perspective, too, the scienter requirement ensures that limited enforcement resources go where they are most needed, protecting investors and preserving public confidence in the fairness and integrity of the securities laws.

**EX 5**

17

## II. THE DECISION BELOW UNDERMINES SECTION 10(b)'S SCIENTER REQUIREMENT.

If allowed to stand, the decision below would cut back on decades of rigorous judicial enforcement of Section 10(b)'s scienter requirement. The Ninth Circuit's approach collapses scienter into falsity and sweeps aside the PSLRA's heightened pleading standard. This case would thus provide a playbook for future plaintiffs to survive a motion to dismiss with no real evidence of intentional wrongdoing.

### A. The Ninth Circuit's Approach Conflates Scienter With Falsity.

1. The reasoning in the decision below allows plaintiffs to effectively infer scienter from falsity, negating scienter as an independent element of a Section 10(b) claim. If allowed to stand, the decision would return the Ninth Circuit to its pre-PSLRA days when it allowed mere general allegations of scienter.

The formula the court below endorsed is simple. First, hire an expert to generate data that contradicts a company's public statements—which, in the Ninth Circuit's view here, suffices to plead falsity. Next, allege that the company maintains internal reports (as virtually all companies do) and name as a defendant a conscientious executive who had access to such internal reports (as virtually all high-level executives do). Finally, toss in a couple assumptions framed as inferences: (i) that the company's internal reports contained data equivalent to the data generated by the plaintiff's expert, and (ii) that the defendant reviewed those internal reports before making the challenged statements. Put together, those few simple steps transform an expert report commissioned to establish *falsity* into a sufficient allegation of *scienter*.

**EX 5**

108

18

Other courts have rejected similar modes of reasoning. For example, in *Anderson* v. *Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229 (10th Cir. 2016), the plaintiffs alleged that Spirit executives had knowingly or recklessly misled the public about cost overruns and production delays, *id.* at 1235-1236. To establish scienter, the plaintiffs generally alleged that Spirit maintained internal cost reports showing that the company would suffer significant losses on the projects at issue. *Id.* at 1239-1240. The Tenth Circuit held that, even assuming the executives' public representations were false, those allegations were insufficient to establish scienter. *See id.* at 1236-1237 & 1236 n.3. The court noted that the plaintiffs had failed to "adequately describe the content of the reports" or allege that the "Spirit executives actually had seen" reports containing accurate cost projections. *Id.* at 1240-1241; *see Meitav Dash Provident Funds & Pension Ltd.* v. *Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1216 (10th Cir. 2023) ("[I]t's not enough for the plaintiffs to allege . . . the speaker's access to internal reports."); *cf. In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (holding that the complaint adequately pleaded scienter because it contained "detailed allegations as to what defendants knew on a daily, weekly and monthly basis").

2. The formula embraced in the decision below is simple enough for a plaintiff to execute, but it is impermissible under this Court's cases and the PSLRA. If establishing falsity were effectively all it took to plead scienter, then scienter would be reduced to a nullity. For the scienter pleading requirement to do any independent work, a plaintiff must, at a minimum, set forth particularized facts giving rise to a strong inference that (1) the company had internal reports containing

**EX 5**

109

19

correct information, and (2) the defendant executive knew the contents of those specific reports.

On the first point, a plaintiff must plead facts about the contents of a *particular* report to establish that the report actually contained correct information. On the second, a plaintiff has a couple of options. The most straightforward path is to plead facts establishing that the defendant actually reviewed the relevant report. Alternatively, a plaintiff might be able to plead scienter by showing that the defendant habitually examined a specific type of report, creating a strong inference that he would have reviewed the particular report at issue. Either way, the plaintiff must allege that the correct information was contained in a *real internal report*. And the inference of scienter drawn from those particularized allegations "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

By contrast, a plaintiff cannot rely on pure speculation about company documentation. In other words, a plaintiff cannot hypothesize that a report reflecting correct information *probably* existed somewhere in the company's files, and that the defendant *probably* would have seen that hypothetical report. Those types of allegations are the opposite of "particularized" facts under Rule 9(b); they simply assume that the "truth" revealed in the commissioned expert report was so important or obvious that it must have been known. Nor do those allegations establish a "strong inference" of scienter; they rest on multiple layers of unsupported supposition. *See* Pet. App. 74a (Sanchez, J., dissenting) ("The majority's approach significantly erodes the heightened pleading requirements for alleging security fraud under the PSLRA."); *see also Anderson*, 827

**EX 5**

110

20

F.3d at 1239 ("[G]eneralized descriptions of . . . [internal] reports . . . do not contribute to a cogent, compelling inference of scienter.").

### B. The Facts Here Illustrate The Flaws In The Ninth Circuit's Approach.

The decision below illustrates the flaws in the Ninth Circuit's new approach to scienter. In this case, NVIDIA shareholders brought a putative class action alleging that NVIDIA's CEO, Jensen Huang, made materially misleading statements about the percentage of NVIDIA GeForce graphics processing units (GPUs) sold downstream to cryptocurrency miners. The court of appeals held that the plaintiffs had adequately alleged falsity by hiring a consulting firm to produce a report concluding that the percentage of GeForce GPUs purchased by cryptocurrency miners was much higher than Huang had represented. To be clear, this was not an *actual company report* that NVIDIA had generated or that Huang had ever seen. It was a post hoc, litigation-driven expert report, reflecting the plaintiffs' view of what might have happened, regardless of what actually happened.

Starting with that basis for falsity, the court of appeals concluded that the plaintiffs had established a "strong inference" of scienter through two additional assumptions. *See* Pet. App. 41a-43a. First, the court assumed that NVIDIA's internal sales database would have contained data about the percentage of sales to cryptocurrency miners and that the data "would have shown" the same percentage as did the plaintiffs' expert report. *Id.* at 42a. Second, it assumed that Huang would have reviewed those sales figures before he made the challenged statements because he had general access to internal company reports and was a "highly competent" executive with a "detail-oriented

**EX 5**

111

21

management style." *Id.* at 41a, 55a (citation omitted). Putting those assumptions together, the court found that the plaintiffs had "sufficiently pleaded" that Huang "knowingly or recklessly made false or misleading statements about the degree to which NVIDIA's revenues were dependent on sales of GeForce GPUs to crypto miners." *Id.* at 41a.

Even assuming that the plaintiffs adequately alleged that Huang's public statements were false (*i.e.*, that the plaintiffs' expert's data was correct), the court of appeals' conclusion that Huang made those false statements with scienter is unsupported. There are numerous scenarios in which Huang could have incorrectly reported the percentage of GeForce GPUs sold downstream to cryptocurrency miners without intending to deceive anyone. We offer three.

First, NVIDIA's internal reports may not have contained data on the specific percentage of sales to cryptocurrency miners for the relevant periods. After all, the vast majority of NVIDIA's sales were to device manufacturers, not directly to end users, and the company had no way of precisely tracking how end users were using their GPUs. *See* Pet. 25. Second, even if NVIDIA's internal reports did contain data on purchases by cryptocurrency miners, the data might have been incorrect. The chain of device manufacturers, distributors, and retailers between NVIDIA and end users made it "'difficult to quantify' what portion of cryptocurrency-mining demand was met by GeForce GPU sales." Pet. App. 82a. Third, even if there were internal reports containing accurate data, Huang might not have reviewed them before making the challenged statements. It is particularly difficult to discern whether an executive would have reviewed certain data

**EX 5**

112

22

without knowing what particular report (if any) the data would have appeared in.

That there are several possible innocent explanations for the defendant's allegedly false statements illustrates why a separate scienter requirement exists in the first place. One cannot assume from mere allegations of falsity that the defendant had the truth available to him, saw and internalized it, and thus sought to manipulate or deceive. As Judge Sanchez emphasized in his dissent, "a miscalculation, without more, does not create a claim for securities fraud." Pet. App. 88a.

\* \* \*

Scienter has been a cornerstone of Section 10(b) for half a century. By reducing the scienter pleading requirement to alleged falsity plus an unsupported inference or two, the Ninth Circuit's approach obscures the critical distinction between culpable misconduct and negligent missteps. If allowed to stand, the decision below will expand a judicially inferred private right of action and reopen the door to precisely the kind of meritless claims against good-faith actors that Congress sought to eliminate in the PSLRA.

EX 5

23

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

CONNIE L. WANG
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA  94301
(650) 461-5600

MORGAN L. RATNER
  *Counsel of Record*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC  20006
(202) 956-7522
ratnerm@sullcrom.com

APRIL 5, 2024

EX 5

114