# EXHIBIT 8

No. 23-970

IN THE

## Supreme Court of the United States

NVIDIA CORPORATION, *et al.*,

*Petitioners,*

*v.*

E. OHMAN J:OR FONDER AB, *et al.*

*Respondents.*

ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## BRIEF IN OPPOSITION

MATTHEW L. MUSTOKOFF
ANDREW L. ZIVITZ
KESSLER TOPAZ MELTZER
  & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087

GREGORY P. JOSEPH
  *Counsel of Record*
RACHEL M. CHERINGTON
COURTNEY A. SOLOMON
JOSEPH HAGE AARONSON, LLC
800 Third Avenue, 30th Floor
New York, NY 10022
(212) 407-1200
gjoseph@jhany.com

*Counsel for Respondents*

*(Additional Counsel Listed on Inside Cover)*

328203



COUNSEL PRESS
(800) 274-3321 • (800) 359-6859

**EX 8**

157

STACEY M. KAPLAN
KESSLER TOPAZ MELTZER
   & CHECK, LLP
One Sansome Street,
   Suite 1850
San Francisco, CA 94104

JOHN RIZIO-HAMILTON
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1251 Avenue of the
   Americas, 44th Floor
New York, NY 10020

JONATHAN D. USLANER
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
2121 Avenue of the Stars,
   Suite 2575
Los Angeles, CA 90067

*Counsel for Respondents*

**EX 8**

*i*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, Respondents hereby state that Respondent E. Öhman J:or AB, a privately held entity, is the ultimate parent of E. Öhman J:or Fonder AB ("**Öhman Fonder**"). No publicly held corporation owns 10% of more of Öhman Fonder's stock. Respondent Stichting Pensioenfonds PGB ("**PGB**") does not have a parent corporation. No publicly held corporation owns 10% or more of PGB's stock.

**EX 8**

159

*ii*

## TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . . iv

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . .4

    A.   Statutory and Regulatory Background . . . . . . . .4

    B.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . .7

    C.   Procedural History. . . . . . . . . . . . . . . . . . . . . . . .11

REASONS FOR DENYING THE PETITION . . . . . .17

    I.   THE NINTH CIRCUIT'S CONCLUSION THAT PLAINTIFFS ADEQUATELY ALLEGED SCIENTER WAS CORRECT AND DID NOT "DEEPEN" A CIRCUIT SPLIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

        A.   The Ninth Circuit's Decision Was Correct . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

        B.   Petitioners Manufacture an Illusory Circuit Split . . . . . . . . . . . . . . . . . . . . . . . .22

**EX 8**

160

*iii*

*Table of Contents*

*Page*

II. THE NINTH CIRCUIT'S CONSIDERATION OF EXPERT ANALYSIS WAS PROPER AND DID NOT CREATE A CIRCUIT SPLIT . . . . . . . . . . . . . .25

    A. The Ninth Circuit's Falsity Analysis Was Correct . . . . . . . . . . . . . . . . . . . . . . . . .26

    B. The Ninth Circuit's Consideration Of Expert Analysis Did Not Create A Split . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

III. THIS CASE IS A POOR VEHICLE FOR RESOLVING THESE ISSUES . . . . . . . .34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

**EX 8**

161

*iv*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases:**

*ABC Arbitrage Plaintiffs Grp.* v. *Tchuruk,*
  291 F.3d 336 (5th Cir. 2002) . . . . . . . . . . . . . . . . .20, 24

*Abrams* v. *Baker Hughes Inc.,*
  292 F.3d 424 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . .19

*Ackerman* v. *Nw. Mut. Life Ins. Co.,*
  172 F.3d 467 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . .36

*Adams* v. *Kinder-Morgan, Inc.,*
  340 F.3d 1083 (10th Cir. 2003) . . . . . . . . . . . 20, 23, 30

*Altimeo Asset Mgmt.* v. *Qihoo 360 Tech. Co.,*
  19 F.4th 145 (2d Cir. 2021). . . . . . . . . . . . . . . . . . .33-34

*Anderson* v. *Spirit AeroSystems Holdings, Inc.,*
  827 F.3d 1229 (10th Cir. 2016). . . . . . . . . . . . . . . . . .25

*Arazie* v. *Mullane,*
  2 F.3d 1456 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . .24

*Ark. Pub. Emps. Ret. Sys.* v.
  *Bristol-Myers Squibb Co.,*
  28 F.4th 343 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 32, 33

*Ashcroft* v. *Iqbal,*
  556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . .26, 27

**EX 8**

*v*

*Cited Authorities*

*Page*

*Barrie* v. *Intervoice-Brite, Inc.,*
  397 F.3d 249 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . .33

*Bell Atlantic Corp.* v. *Twombly,*
  550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Blanchard-Daigle* v. *Geers,*
  802 F. App'x 113 (5th Cir. 2020) . . . . . . . . . . . . . . . . .34

*Bond* v. *Clover Health Invs., Corp.,*
  587 F. Supp. 3d 641 (M.D. Tenn. 2022) . . . . . . . . . . .31

*Calloway* v. *Marvel Ent. Grp.,*
  111 F.R.D. 637 (S.D.N.Y. 1986), *aff'd in
  relevant part*, 854 F.2d 1452 (2d Cir. 1988),
  *rev'd in part on other grounds sub nom.
  Pavelic & LeFlore v. Marvel Ent. Grp.,*
  493 U.S. 120 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.,*
  394 F.3d 126 (3d Cir. 2004) . . . . . . . . . . . . . . . . . 24, 28

*Coastal Transfer Co.* v.
  *Toyota Motor Sales, USA,*
  833 F.2d 208 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . .29

*Comcast Corp.* v. *Behrend,*
  569 U.S. 27 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Dura Pharms., Inc.* v. *Broudo,*
  544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .5

**EX 8**

*vi*

*Cited Authorities*

*Page*

*Fin. Acquisition Partners, LP* v. *Blackwell,*
2004 WL 2203253 (N.D. Tex. Sept. 29, 2004)...32-33

*Fin. Acquisition Partners, LP* v. *Blackwell,*
440 F.3d 278 (5th Cir. 2006) ................ 32, 33

*Glazer Cap. Mgmt., L.P.* v. *Forescout Tech., Inc.,*
63 F.4th 747 (9th Cir. 2023).....................34

*Helwig* v. *Vencor, Inc.,*
251 F.3d 540 (6th Cir. 2001).....................23

*In re Cabletron Sys., Inc.,*
311 F.3d 11 (1st Cir. 2002) ......................19

*In re Cassava Sci., Inc. Sec. Litig.,*
2023 WL 3442087 (W.D. Tex. May 11, 2023) ......30

*In re Harman Int'l Indus., Inc. Sec. Litig.,*
791 F.3d 90 (D.C. Cir. 2015).....................20

*In re Nektar Therapeutics Sec. Litig.,*
34 F.4th 828 (9th Cir. 2022).....................34

*In re Quality Sys., Inc. Sec. Litig.,*
865 F.3d 1130 (9th Cir. 2017)....................19

*In re Scholastic Corp. Sec. Litig.,*
2000 WL 91939 (S.D.N.Y. Jan. 27, 2000).........23

**EX 8**

*vii*

*Cited Authorities*

*Page*

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . 23, 24

*Inst'l Invs. Grp.* v. *Avaya, Inc.,*
    564 F.3d 242 (3d Cir. 2009) . . . . . . . . . . . . . . . . . 22, 30

*Jones* v. *Bock,*
        549 U.S. 199 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . .36

*Lipton* v. *Pathogenesis Corp.,*
        284 F.3d 1027 (9th Cir. 2002). . . . . . . . . . . . . . . . . .19

*Matrixx Initiatives, Inc.* v. *Siracusano,*
        563 U.S. 27 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Meitav Dash Provident Funds & Pension Ltd.* v.
    *Spirit AeroSystems Holdings, Inc.,*
    79 F.4th 1209 (10th Cir. 2023) . . . . . . . . . . . . . . . . . .25

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v.
    *Dabit,*
    547 U.S. 71 (2006). . . . . . . . . . . . . . . . . . . . . . . . . .4, 5, 6

*New Orleans Emps. Ret. Sys.* v. *Celestica, Inc.,*
    455 F. App'x 10 (2d Cir. 2011) . . . . . . . . . . . . . . . . . .20

*Nursing Home Pension Fund, Local 144* v.
    *Oracle Corp.,*
    380 F.3d 1226 (9th Cir. 2004) . . . . . . . . . . . . . . . . . .34

**EX 8**

*viii*

## Cited Authorities

*Page*

*Okla. Firefighters Pension & Ret. Sys.* v. *Six Flags Ent. Corp.,* 58 F.4th 195 (5th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . .20

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Ottmann* v. *Hanger Orthopedic Grp., Inc.,* 353 F.3d 338 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . .23

*Pub. Emps.' Ret. Sys.* v. *Amedisys, Inc.,* 769 F.3d 313 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . .33

*Ricciuti* v. *N.Y.C. Transit Auth.,* 941 F.2d 119 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . .30

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.,* 75 F.3d 801 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . .19

*Smith* v. *Bayer Corp.,* 564 U.S. 299 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

*Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.,* 365 F.3d 353 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . .19

*Stoneridge Inv. Partners, Inc.* v. *Sci.-Atlanta, Inc.,* 552 U.S. 148 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

**EX 8**

*ix*

*Cited Authorities*

*Page*

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007). . . . . . . .1, 5, 6, 17, 19, 22, 26, 27, 30

*United States* v. *O'Hagan,*
    521 U.S. 642 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*Vulcan Metals Co.* v. *Simmons Mfg. Co.,*
    248 F. 853 (2d Cir. 1918) . . . . . . . . . . . . . . . . . . . . . . .28

**Statutes:**

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

15 U.S.C. § 78u-4(b)(1). . . . . . . . . . . . . . . . . . . . . . .7, 27, 29

15 U.S.C. § 78u-4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . .29

15 U.S.C. § 78u-4(b)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . .7

15 U.S.C. § 78u-4(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . .7, 29

15 U.S.C. § 78u-4(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . .7, 29

Conn. Gen. Stat. Ann. § 52-190a . . . . . . . . . . . . . . . . . .36

Del. Code Ann. tit. 18, § 6853 . . . . . . . . . . . . . . . . . . . . .36

**Regulations:**

17 C.F.R. § 240.10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

**EX 8**

*x*

## Cited Authorities

*Page*

17 C.F.R. § 240.10b-5(b) . . . . . . . . . . . . . . . . . . . . . . . . . .5

**Rules:**

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

Fed. R. Civ. P. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

Fed. R. Civ. P. 10(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

Fed. R. Civ. P. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

Fed. R. Civ. P. 11(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 7

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . .30, 31

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Fed. R. Civ. P. 23(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

Sup. Ct. R. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

**Legislative Material:**

H.R. Rep. No. 104-369 (1995) (Conf. Rep.) . . . . . . . . . .6, 7

S. Rep. No. 104-98 (1995) . . . . . . . . . . . . . . . . . . . . . . .7, 36

**EX 8**

*xi*

*Cited Authorities*

*Page*

**Other Authorities:**

Black's Law Dictionary (11th ed. 2019) . . . . . . . . . . . . .29

Press Release No. 2022-79, SEC Charges NVIDIA
Corp. with Inadequate Disclosures About
Impact of Cryptomining (May 6, 2022), https://
www.sec.gov/news/press-release/2022-79 . . . . . . . . .2

SEC Order, *In the Matter of NVIDIA Corp.*, Admin.
Proc. No. 3-20844 (May 6, 2022), https://www.sec.
gov/files/litigation/admin/2022/33-11060.pdf . . . . . . .2

**EX 8**

1

## INTRODUCTION

The reforms introduced in the Private Securities Litigation Reform Act ("**PSLRA**")—heightened pleading standards for falsity and scienter, and mandatory sanctions for violations of FED. R. CIV. P. 11(b)—were designed to reduce frivolous suits by requiring plaintiffs and their counsel to conduct adequate pre-filing investigations. This case worked exactly as Congress intended in enacting the PSLRA. To confirm they had a meritorious action, Plaintiffs conducted extensive due diligence, including interviewing knowledgeable former NVIDIA Corporation ("**NVIDIA**") employees whose detailed accounts are pled with specificity in the complaint; analyzing and relying on an international investment bank's independent, published study of NVIDIA's deception; and retaining an expert consulting firm, whose analysis corroborated the investment bank's conclusions. Plaintiffs' complaint foreshadowed and served as an "essential supplement"[1] to later-filed charges brought by the Securities and Exchange Commission ("**SEC**") mirroring Plaintiffs' claims. The SEC's subsequent enforcement action corroborates the merit of Plaintiffs' allegations and vindicates Plaintiffs' due diligence.

Plaintiffs allege that in 2017, sales of NVIDIA's flagship product—graphics processing units ("**GPUs**") called **GeForce GPUs**—were generating record-breaking revenues. As reports from multiple former employees confirmed, NVIDIA and CEO Jensen Huang knew those record sales were due in substantial part to demand from

---

1. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

**EX 8**

170

2

cryptocurrency miners. But for more than a year, Huang denied that mining-related sales were driving NVIDIA's revenue growth because he knew that the securities market looked askew at GPU sales to miners, which are notoriously cyclical. Huang's strategy fell apart in late 2018, when cryptocurrency prices collapsed, GPU purchases by miners withered, and demand for GeForce GPUs shrank dramatically. NVIDIA then finally admitted that—contrary to Huang's previous denials—its record revenue growth had been largely due to mining-related demand for GeForce GPUs.

In May 2022, the SEC announced it had charged NVIDIA with inadequate disclosures in NVIDIA's Form 10-Q for May to July 2017 and August to October 2017 (all within Plaintiffs' proposed class period). The SEC concluded that NVIDIA had information indicating that mining-related purchases of GeForce GPUs were a significant factor in its revenue growth but failed to disclose this in its 10-Qs.[2]

Plaintiffs' suit against NVIDIA and Huang, alleged— as did the SEC subsequently—that NVIDIA and Huang had information contradicting their public assertions that NVIDIA's massive revenue growth was not due to mining-related GeForce GPUs sales. To support their allegations, Plaintiffs relied, *inter alia*, on reports from former employees, all of whom (i) confirmed that

---

2.  *See, e.g.*, Press Release No. 2022-79, SEC Charges NVIDIA Corp. with Inadequate Disclosures About Impact of Cryptomining (May 6, 2022), https://www.sec.gov/news/press-release/2022-79; SEC Order, *In the Matter of NVIDIA Corp.*, Admin. Proc. No. 3-20844 (May 6, 2022), https://www.sec.gov/files/litigation/admin/2022/33-11060.pdf.

**EX 8**

171

3

their allegations, Plaintiffs relied, *inter alia*, on reports from former employees, all of whom (i) confirmed that NVIDIA tracked mining-related sales in multiple ways; explained how such information was collected, disseminated and reviewed—including by Huang—and (ii) provided detailed descriptions about the contents of such sources. Plaintiffs relied on a published analysis by the international investment bank RBC Capital Markets ("**RBC**"), which concluded that NVIDIA had generated over a billion dollars more in mining-related revenues than it had previously disclosed. In a further exercise in due diligence, Plaintiffs retained an expert consulting firm whose independent analysis ultimately came to conclusions substantially identical to RBC's.[3]

Petitioners contend that the Ninth Circuit's decision deepened a circuit split with respect to scienter, created one with respect to falsity, and thwarted Congress's intent in enacting the PSLRA. There is no merit to any of this. With respect to scienter, Petitioners flagrantly mischaracterize Plaintiffs' allegations, simply reading out of the complaint Plaintiffs' detailed allegations concerning the "actual contents" of NVIDIA's internal documents. Further, Petitioners' claims of a Circuit split on scienter cannot withstand analysis. In reality, there is no conflict. No Circuit has imposed, as Petitioners effectively urge here, a categorical rule requiring pleading of detailed evidentiary matter to survive a motion to dismiss. Indeed, given the PSLRA's stay on discovery, any such requirement would effectively immunize defendants from even meritorious securities fraud claims.

---

3. App. 18a, 23a, 45a.

**EX 8**

172

4

With respect to falsity, Petitioners have not identified a circuit split that warrants this Court's intervention. Neither the Second nor Fifth Circuit has a categorical rule prohibiting reliance on an expert in pleading falsity—to the contrary, both, like the Ninth Circuit, permit reliance on expert analyses. Petitioners insist that reliance on an expert was improper, but neither the PSLRA nor this Court's precedent can be construed as proscribing reliance on expert analysis in a pleading. When enacting the PSLRA, Congress sought to require *greater* due diligence. In a business world of dizzying complexity, it would be antithetical to the purpose of the PSLRA to hold, as Petitioners suggest, that Plaintiffs cannot rely on the additional due diligence of hiring an independent expert to ensure the vitality of their complaint. Such a holding would be particularly odd here, where the expert's analysis corroborates, and is corroborated by, the independent study of an international investment bank on which Plaintiffs indisputably had the right to rely in their complaint.

This Court should deny certiorari.

**STATEMENT OF THE CASE**

**A.  Statutory and Regulatory Background**

Since Congress enacted the Securities Act of 1933 and the Securities Exchange Act of 1934 ("**Exchange Act**"), "these two statutes have anchored federal regulation of vital elements" of the U.S. economy. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71, 78 (2006). One "animating purpose of the Exchange Act [is] to [e]nsure honest securities markets and thereby

**EX 8**

173

5

promote investor confidence." *United States* v. *O'Hagan*, 521 U.S. 642, 658 (1997). Section 10(b) of the Exchange Act promotes investor confidence by prohibiting the use of "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b).[4] Though the Exchange Act "seek[s] to maintain public confidence" through governmental action, *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005), this Court has long held that there also exists a private right of action for complaints alleging false or misleading statements under Section 10(b) and Rule 10b-5. As this Court has explained, "meritorious private actions" are "an essential supplement" to civil actions brought by the SEC and criminal actions brought by the Department of Justice. *Tellabs*, 551 U.S. at 313; *Dabit*, 547 U.S. at 81 (private actions are "indispensable"). Private plaintiffs can recover for a violation of Rule 10b-5 if they prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, Inc.* v. *Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2007). The first two elements—falsity and scienter—are at issue here.

In 1995, Congress enacted the PSLRA to curb perceived abuses of private securities fraud actions,

---

4. SEC Rule 10b-5, which implements Section 10(b), makes it unlawful to, "in connection with the purchase or sale of any security," "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

**EX 8**

174

6

including the "routine filing of lawsuits against issuers of securities" upon a significant change in stock price, "targeting of deep pocket defendants … without regard to actual culpability," and "abuse of the discovery process." H.R. REP. NO. 104-369, at 31 (1995) (Conf. Rep.); *see also Dabit*, 547 U.S. at 81. But Congress also recognized that private securities actions are essential to functioning capital markets because they permit "defrauded investors [to] recover their losses without having to rely upon government action," which "promotes[s] public and global confidence in our capital markets" and deters corporate wrongdoing. H.R. REP. NO. 104-369, at 31 (1995) (Conf. Rep.). Thus, in enacting the PSLRA, Congress made several changes that, together, aim at deterring frivolous private securities actions, not rendering it impossible to bring private securities claims at all. *See Tellabs*, 551 U.S. at 322 (the PSLRA's "twin goals" are to reduce frivolous actions "while preserving investors' ability to recover on meritorious claims"). These changes include:

(i)  Requiring courts to presume that the "most adequate plaintiff" is the party "with the largest financial stake in the relief sought"—typically an institutional investor (H.R. REP. NO. 104-369, at 34 (1995) (Conf. Rep.))—premised on the thesis that institutional investors are the "parties more likely to balance" class interests with "the long-term interests of the company," *Tellabs*, 551 U.S. at 320-21;

(ii)  Requiring courts to stay discovery pending a decision on a motion to dismiss (H.R. REP. NO. 104-369, at 37 (1995) (Conf. Rep.));

**EX 8**

175

7

    (iii) Imposing heightened standards for pleading falsity and scienter (15 U.S.C. § 78u-4(b)(1) and (b)(2)(A));[5] and

    (iv) Ensuring adequate due diligence by requiring the court to include in the record findings as to compliance with FED. R. CIV. P. 11(b) with respect to every complaint, responsive pleading, or dispositive motion, and making sanctions mandatory upon a finding that an attorney or party violated Rule 11(b) (15 U.S.C. § 78u-4(c)(1)-(2); H.R. REP. NO. 104-369, at 39 (1995) (Conf. Rep.); *see also* S. REP. NO. 104-98, at 8 (1995) (a complaint can currently be filed with "little or no due diligence")).

## B. Factual Background

    NVIDIA is one of the world's largest producers of GPUs, which were developed for use in video gaming. App. 7a. Because GPUs permit electronic devices to perform efficiently complex computational tasks, they are also used in tasks that require repetitive computation, such as cryptocurrency mining. *Id.* In recent years, as cryptocurrency demand has grown, mining-related

---

    5. For scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A). With respect to falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

**EX 8**

176

8

demand for GPUs has also grown. App. 8a. Although that demand can dramatically increase the revenues of GPU producers, the volatility of cryptocurrency demand makes reliance on such demand risky—as investors saw prior to 2017 when the revenues of NVIDIA's chief competitor skyrocketed as Bitcoin prices rose and crashed when Bitcoin prices fell. App. 8a-9a.

Though NVIDIA's GeForce GPUs were originally designed for gaming, miners began purchasing GeForce GPUs "in droves" when cryptocurrency prices rose in 2017. App. 9a-11a. In May 2017, NVIDIA launched a GPU designed for cryptocurrency mining ("**Crypto SKU**"), but miners "continued to purchase enormous numbers of GeForce GPUs." App. 11a. NVIDIA did not attempt deter these sales. On the contrary, when, in January 2018, NVIDIA revised its end-user license agreement to prohibit use of GeForce GPUs in corporate datacenters, NVIDIA included a carve-out that explicitly permitted the continued use of GeForce GPUs in *mining* datacenters. App. 11a-12a; 3-ER-366-67:¶¶135-38.

Although NVIDIA generally sells its GPUs to device manufacturers, known as "partners," rather than to end users (miners or gamers), NVIDIA "carefully monitors" "sellout" in its "channel"—*i.e.*, the purchase of GPUs *from* its partners. App. 9a-10a. In 2015, Huang assured investors that "we monitor sellout in the channel literally every day" and in August 2018 told analysts that "[w]e are masters at managing our channel, and we understand the channel very well." App. 10a; 3-ER-391:¶216.

Between May 2017 and November 2019 (the "**Class Period**"), NVIDIA recorded its revenues in five segments.

**EX 8**

177

9

Of those, two are relevant here: "Gaming" and "OEM." App. 9a. The Gaming segment was NVIDIA's largest by revenue and, during the class period, generated more revenue than NVIDIA's other four segments combined. App. 10a. NVIDIA recorded revenues from sales of its GeForce GPUs in its Gaming segment, regardless of whether the end users were gamers or miners. App. 9a-11a, 19a.

After introducing CryptoSKU—the GPU designed for mining—NVIDIA recorded revenues from it in the OEM segment—a relatively minor segment that contributed less than 10% of NVIDIA's revenues during the Class Period. App. 10a-11a; 3-ER-325:¶6. Other revenue recorded in the OEM segment came from NVIDIA's "low-end GPUs" and intellectual-property assets. App. 10a.

Beginning in 2017, NVIDIA began reporting massive revenue growth in its Gaming segment. In May 2017, NVIDIA recorded first-quarter Gaming segment revenues of $1.02 billion—a 49% year-over-year increase, and 52.8% of NVIDIA's total quarterly revenue. App. 11a. NVIDIA reported spectacular growth in its Gaming segment each quarter over the next year. In May 2018, it reported Gaming-segment revenues of $1.723 billion—a 68% year-over-year increase, and approximately 2.5 times the revenue for that segment two years prior. *Id.*

Concerned about the cryptocurrency market's inherent volatility, analysts and investors repeatedly asked whether NVIDIA's dramatic revenue increases in its Gaming segment were due to mining-related sales. App. 12a. NVIDIA's executives reassured investors that NVIDIA was tracking its sales and repeatedly denied that

**EX 8**

178

10

NVIDIA's explosive growth in its Gaming segment was due to mining. *Id.*; 3-ER-343:¶66. NVIDIA's executives falsely assured analysts and investors that NVIDIA's mining-related revenues were confined to the OEM segment. App. 12a; 3-ER-343:¶66. For example, in August 2017, in response to an analyst's query as to whether cryptocurrency drove NVIDIA's growth, Huang said that "CryptoSKU accounted for just $150 million of second-quarter revenues," and that CryptoSKU satisfied the "vast" majority of mining demand. 3-ER-383-84:¶¶179-82; *see also* 3-ER-384-85:¶¶183-86. In November 2017, Huang again said that mining-related revenue amounted to $70 million—the amount NVIDIA had attributed to sales of CryptoSKU reported in the OEM segment. 3-ER-386-87:¶¶193-99.

By August 2018, as the profitability of cryptocurrency mining fell, sales of GeForce GPUs dropped as well, and NVIDIA lowered its revenue guidance for the upcoming quarter. App. 13a. In a partial correction of its earlier assurances that its revenue growth was *not* due to mining-related demand, NVIDIA attributed its lowered revenue guidance to the lack of mining-related sales. 3-ER-375:¶155. Huang conceded that "probably … a great deal" of miners had purchased GeForce GPUs, but downplayed ongoing concern. *Id.* Huang did not disclose that NVIDIA had built up its inventory of GeForce GPUs to satisfy mining demand, and gaming demand was insufficient to mitigate the loss of mining-related demand. 3-ER-376:¶158.

On November 15, 2018, NVIDIA announced it had missed its revenue projections. Contradicting his earlier assurances that NVIDIA's revenue growth was not due

**EX 8**

179

11

to mining-related demand, Huang attributed NVIDIA's revenue miss to excess channel inventory resulting from a "crypto hangover." App. 13a. Analysts immediately recognized this as a reversal of NVIDIA's prior reassurances that mining-related demand represented a small portion of revenues. 3-ER-379-80:¶¶166-70.

Following NVIDIA's November 15, 2018 disclosures, NVIDIA's stock price fell 28.5% in two trading days. App. 13a.

On May 6, 2022, the SEC announced that it had settled charges concerning inadequate disclosures in NVIDIA's Form 10-Q for May to July 2017 and August to October 2017. The SEC concluded that NVIDIA had information indicating that mining-related purchases of GeForce GPUs were a significant factor in its revenue growth but failed to disclose this in its 10-Qs. *See* n.2, *supra*.

## C. Procedural History

After NVIDIA's share price dropped and after conducting significant due diligence, Plaintiffs filed this putative class action alleging that Defendants' statements during the Class Period were materially false and misleading because they failed to state, or underreported, the extent to which NVIDIA's massive Gaming-segment revenue growth was attributable to mining-related sales of GeForce GPUs. App. 17a.

Defendants moved to dismiss the complaint. With respect to falsity, Defendants argued that Plaintiffs' description of an expert analysis by Prysm Group ("**Prysm**"), which Plaintiffs included in the complaint

**EX 8**

180

12

to support their estimate of NVIDIA's mining-related revenues, did not sufficiently detail Prysm's underlying assumptions. App. 143a-145a. The District Court granted Defendants' motion with respect to falsity, holding that Plaintiffs' description of Prysm's assumptions and analysis lacked "sufficient particularity" to demonstrate "that its conclusions are reliable." App. 147a. With respect to scienter, the District Court held that witness reports in the complaint were unreliable, and that Plaintiffs' allegations were insufficient under the "core operations" doctrine. App. 149a-155a.

Plaintiffs then filed the operative first amended complaint ("**FAC**"), adding a host of detailed allegations supporting scienter and falsity.

To allege scienter, Plaintiffs relied on former NVIDIA employees ("**FEs**"), who reported that sales and usage data available to Huang and anecdotal reports confirmed the surge in mining-related sales of GeForce GPUs during the Class Period. 3-ER-392:¶219. FE-1 reported that throughout 2017, miners were placing massive orders for GeForce GPUs—often in quantities of 50,000 or 100,000 units per order. 3-ER-364:¶127. FE-2 reported that miners came to NVIDIA's headquarters to purchase Gaming graphics cards in bulk—a phenomenon discussed by Huang during meetings. 3-ER-364-65:¶¶128-30. FE-4 estimated that by 2018, 50% of all GeForce GPUs sold in Russia were to miners. 3-ER-365:¶131. These FEs also reported that NVIDIA executives knew of shortages of GeForce GPUs in 2016 and 2017. 3-ER-364-65:¶¶127-31.

Two FEs reported that mining-related demand was discussed during quarterly meetings with Huang. FE-2

**EX 8**

181

13

reported that Huang discussed miners' preference for GeForce GPUs and NVIDIA's inability to get miners to purchase alternatives. 3-ER-350-52:¶¶87-88, 92-93. According to FE-2, Huang focused on GeForce GPU sales because GeForce GPU revenues were larger than those of any other product. 3-ER-351-52:¶¶92-93.

FE-1 reported that NVIDIA's "centralized sales database," which Huang admitted he reviewed, showed that throughout 2017, mining-related sales accounted for 60-70% of NVIDIA's GeForce GPUs in China (NVIDIA's largest geographical market). 3-ER-347-50:¶¶79-81, 83-86. FE-1 also reported that data generated from NVIDIA's GeForce Experience software, which NVIDIA's top executives had access to, reflected explosive mining-related demand for GeForce GPUs. 3-ER-354-56:¶¶99-104, 107-08.

Plaintiffs also alleged that a September 2017 study, commissioned by NVIDIA Executive Vice President Jeff Fisher (who worked closely with Huang), showed that NVIDIA had sold 800,000 GeForce GPUs to miners in China between May and July 2017, and that NVIDIA had captured 70% of the market in China. 3-ER-359-64:¶¶119-126. The study contradicted Huang's August 2017 statement that mining-related sales in that quarter amounted to just the $150 million in CryptoSKU sales reported in the OEM segment. With more than 800,000 GeForce GPUs sold to miners in China, NVIDIA had at least $120 million undisclosed mining-related revenues of GeForce GPUs in China alone. 3-ER-360-61:¶121. The study also discussed strategies to exploit the cryptocurrency market and increase GeForce GPU sales. 3-ER-361-62:¶¶124-25.

**EX 8**

182

14

Additional allegations supporting the strong inference of scienter include those discussing (i) sustained investor interest in NVIDIA's dependence on mining-related sales for revenue growth; (ii) Huang's (and Kress's) public statements quantifying NVIDIA's mining-related sales; (iii) Huang's statements assuring investors that NVIDIA was tracking end users of its products; (iv) NVIDIA's efforts to exploit mining sales; and (v) FEs' reports that Huang was intimately involved in NVIDIA's daily operations. 3-ER-396-400:¶¶230-33, 235-39.[6] Plaintiffs also alleged that NVIDIA's misstatements concerned its primary product, and the undisclosed revenue was enormous—well over $1 billion during the Class Period. *Id.*

In support of falsity, Plaintiffs alleged that FE accounts, the September 2017 study commissioned by Fisher, and a report by RBC Capital Markets confirmed that NVIDIA had large numbers of mining-related sales, with RBC estimating that NVIDIA understated its mining-related revenue by $1.35 billion over an 18-month period inclusive of the Class Period. 3-ER-367-68:¶¶139-41; *see also*, *e.g.*, 3-ER-350:¶86, 3-ER-359-64:¶¶119-126. To confirm the FE accounts and the RBC report, Plaintiffs retained Prysm, an economic consulting firm specializing in blockchain technology, to analyze NVIDIA's reliance on mining-related revenues between May 2017 and July 2018. 3-ER-368-75:¶¶143-54.

Prysm first measured changes in the hashrate (which measures how much computational power is being used for mining) of the three most popular GPU-

---

6.  Plaintiffs are not relying on allegations from FE-5 contained in ¶236 or elsewhere in the FAC.

**EX 8**

183

15

mined cryptocurrencies, relying on data from the blockchain community's two most widely used sources of hashrate data. 3-ER-369-70:¶¶147-49. After calculating the hashrate power added to these networks, Prysm calculated that 16.9 million additional GPU units would have needed to have been sold to miners to provide that increase. 3-ER-370-71:¶150. Then, relying on three sources—a study by Jon Peddie Research (a prominent computer industry research firm that NVIDIA relies on), the RBC report, and an internal September 2017 NVIDIA study—Prysm conservatively estimated that NVIDIA had a 69% share of the mining-related GPU market. 3-ER-372-74:¶152. Finally, Prysm used its estimate of NVIDIA's market share to calculate how many NVIDIA GPU units were used to produce the additional computing power. Prysm estimated that if these GPUs were each sold for (a conservative) $150, NVIDIA would have earned mining-related revenue of $1.728 billion over the period—meaning that NVIDIA understated its mining-related revenue by $1.126 billion. 3-ER-371-74:¶¶152-53.

Defendants moved to dismiss the FAC, again arguing that the Prysm report was unreliable. Without reaching falsity, the District Court dismissed with prejudice, holding that Plaintiffs failed to adequately allege scienter. App. 112a, 122a n.6.

Plaintiffs appealed, and a divided panel of the Ninth Circuit reversed as to Huang and NVIDIA. With respect to scienter, the Ninth Circuit held that Plaintiffs adequately alleged that Huang knowingly or recklessly made false or misleading statements. App. 41a-43a, 55a. The Ninth Circuit concluded that (i) FE-1's reports that he had prepared internal reports and weekly emails detailing

**EX 8**

184

16

crypto sales and had internal conversations with high-level NVIDIA employees about the explosion in sales, (ii) FE-2's statements that he attended meetings during which Huang discussed crypto sales, (iii) allegations that Huang was "a meticulous manager who closely monitored sales data" (including admissions by Huang), and (iv) allegations that data at that time would have shown a large portion of GPU sales were to miners, were sufficient to give rise to a strong inference that Huang "reviewed sales data showing that a large share of NVIDIA's GeForce GPUs sold during the Class Period were being used for crypto mining." App. 37a-43a.

Though the District Court had not reached falsity, Defendants asked the Ninth Circuit to affirm on the ground that the Prysm analysis was unreliable. The Ninth Circuit rejected that argument, holding that Plaintiffs' falsity allegations met the PSLRA's "demanding" requirements. App. 17a-34a. The Ninth Circuit held that the Prysm analysis was "prepared by knowledgeable and competent professionals" and was sufficiently particularized, as required by the PSLRA, because it included a "detailed analysis to support its conclusions." App. 20a-23a.

In addition, the Ninth Circuit held that multiple allegations combined— including the "very similar analyses of RBC and Prysm," reports from FEs that miners were buying large quantities of GeForce GPUs, and the "fact that NVIDIA's earnings collapsed when cryptocurrency prices collapsed and crypto miners quit purchasing NVIDIA's GeForce GPUs"—established that "there is a sufficient likelihood that a very substantial part of NVIDIA's revenues" were from mining-related sales of GeForce GPUs. App. 25a. Responding to the

**EX 8**

17

dissent's contention that the Ninth Circuit had never before permitted a plaintiff to entirely, or primarily, rely on an expert to plead falsity (App. 58a-59a, 69a), the majority stressed that Plaintiffs' falsity allegations did not rest solely on Prysm, and explained that the Prysm analysis and RBC report were "strikingly similar," and that FEs "provide detailed accounts of crypto miners purchasing GeForce GPUs in high volumes." App. 23a, 44a-48a. Further, the Ninth Circuit found that "[t]he sudden and substantial reduction of NVIDIA's earnings projection that followed collapse of crypto prices," as well as Huang's November 2018 statements—in which he reversed his earlier assurances that NVIDIA was insulated from cryptocurrency—further established falsity. App. 45a-48a.

Defendants petitioned for rehearing en banc, arguing for the first time that the Ninth Circuit's decision allowing reliance on an expert created a circuit split. The dissenter, Judge Sanchez, voted to grant the petition. The majority, Judges Wallace and W. Fletcher, recommended denying it. No other judge voted to rehear the matter en banc. App. 168a.

**REASONS FOR DENYING THE PETITION**

**I. THE NINTH CIRCUIT'S CONCLUSION THAT PLAINTIFFS ADEQUATELY ALLEGED SCIENTER WAS CORRECT AND DID NOT "DEEPEN" A CIRCUIT SPLIT**

In accordance with *Tellabs*, the Ninth Circuit reviewed holistically Plaintiffs' allegations—which included detailed statements from former employees reporting meetings

**EX 8**

186

18

with Huang at which mining-related sales of GeForce GPUs were discussed, allegations that NVIDIA's internal reports discussed such sales, and allegations that Huang himself admitted to monitoring sales data—and concluded that Plaintiffs adequately alleged scienter. Petitioners contend that allegations concerning just one category of evidence—NVIDIA's internal reports—was insufficiently detailed, but their argument rests on mischaracterizations of what Plaintiffs actually alleged concerning NVIDIA's internal reports. The FAC's actual allegations are, if anything, more detailed than those that prior Ninth Circuit cases, as well as cases from other circuits, have found sufficiently detailed to meet the heightened pleading standards of the PSLRA.

Nor did the Ninth Circuit "deepen" any circuit split—no circuit has a categorical rule requiring more detail about internal reports than Plaintiffs alleged in the FAC. The only categorical rule circuits follow in assessing the adequacy of scienter allegations is that they reject categorical rules, instead adhering to the fact-based analysis the Ninth Circuit followed here.

### A.   The Ninth Circuit's Decision Was Correct

Petitioners' contention that Plaintiffs did not adequately allege scienter rests on mischaracterizations of (i) the level of detail lower courts require concerning internal reports, (ii) Plaintiffs' allegations, and (iii) the Ninth Circuit's decision.

1. The circuit courts uniformly hold that "generalized assertions" about what internal data showed are insufficiently particularized to support an inference of

**EX 8**

187

19

scienter. *See Lipton* v. *Pathogenesis Corp.*, 284 F.3d 1027, 1035-36, 1038 (9th Cir. 2002) (allegation that defendants could "regularly track its sales data" and "tracked patient demand using" third-party data insufficient without hard numbers or other specific information); *see also, e.g., San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) (Pet. 17-18) (allegations concerning confidential reports amounted to nothing more than an "unsupported general claim of the existence of confidential company sales reports"); *Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 370 (5th Cir. 2004) (Pet. 19) (allegation that information was "known only to the defendants due to their access to internal INSpire data" requires corroborating details); *Abrams* v. *Baker Hughes Inc.*, 292 F.3d 424, 431-32 (5th Cir. 2002) (Pet. 19) (conclusory allegation that defendants received "financial reports that apprized them of the company's true financial status" insufficient to support scienter).

But, consistent with this Court's guidance that scienter be reviewed holistically and that a plaintiff need not prove her case at the outset, *Tellabs*, 551 U.S. at 328-29, lower courts review allegations concerning internal reports in context, and decline to require so much detail as to as to effectively require the pleading of evidence before discovery. *See, e.g., In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1138-39 (9th Cir. 2017) (allegation that sales database included "real-time information concerning QSI revenues and income" sufficiently detailed); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 31-33 (1st Cir. 2002) (allegation that databases reported customer service problems sufficiently detailed; "the rigorous standards for pleading securities fraud do not require a plaintiff to plead

**EX 8**

188

20

evidence"); *New Orleans Emps. Ret. Sys.* v. *Celestica, Inc.*, 455 F. App'x 10, 13, 15 (2d Cir. 2011) (even if plaintiffs could have provided more detail, allegation that internal spreadsheet "detail[ed] the extent of excess and obsolete inventory" was sufficiently particularized; no requirement to plead "detailed evidentiary matter"); *Okla. Firefighters Pension & Ret. Sys.* v. *Six Flags Ent. Corp.*, 58 F.4th 195, 216 (5th Cir. 2023) (allegation that weekly presentations contained details concerning the lack of infrastructure and construction workers, and "lack of progress over 'x number of days'" were sufficiently detailed to support scienter in the context of other allegations); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 108 (D.C. Cir. 2015) (Pet. 20 n.3) (allegations identifying reports as monthly and annual reports, authored by certain executives, and distributed to other executives were sufficiently detailed); *ABC Arbitrage Plaintiffs Grp.* v. *Tchuruk*, 291 F.3d 336, 355-56 (5th Cir. 2002) (Pet. 18-19) (pleading detailed evidentiary matter not required); *Adams* v. *Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) (declining to impose requirement that plaintiff plead evidence).

2. Reviewed in the context of the level of detail actually required by lower courts—and in the context of Plaintiffs' actual allegations rather than Petitioners' distorted descriptions of them—the Ninth Circuit correctly held that Plaintiffs adequately alleged scienter.

Petitioners falsely contend that the FAC lacked particularized allegations concerning the contents of NVIDIA's internal reports and allegations establishing that Huang saw internal reports contradicting his public statements. Pet. 20-23. In fact, as the Ninth Circuit held,

**EX 8**

189

21

Plaintiffs alleged that NVIDIA closely tracked mining-related sales and usage of GeForce GPUs in multiple internal locations—including in its sales database, GeForce Experience data, and weekly emails—bolstering those allegations with details explaining how and by whom such reports were prepared, who had access to them, and what information was included therein. *See* App. 37a-39a (per FE-1, "NVIDIA kept meticulous track of who was buying its GPUs" and input that information into its sales database, which Huang reviewed) and 3-ER-348-50:¶¶80-81, 83-86 (throughout 2017, data in the centralized sales database showed that 60% to 70% of GeForce GPU revenue in China was from mining); App. 38a and 3-ER-354-56:¶¶99-104, 107-08 (NVIDIA tracked usage through GeForce Experience data); App. 42a, 3-ER-353:¶96 and 3-ER-356-57:¶¶109-12 (mining-related sales were discussed in weekly emails).[7] Further, Plaintiffs alleged that FE-1 prepared presentations that both quantified mining-related GeForce GPU sales and suggested strategies to increase those sales. App. 41a-42a; 3-ER-357-64:¶¶115-26.

Petitioners falsely claim that Plaintiffs "provide[] no basis to conclude that NVIDIA sales reports would have shown which sales went to miners" because tracking mining-related sales was challenging. Pet. 20, 25; *see also* SEC Commissioners' Amicus Br. 21-22. But Plaintiffs

---

7. Petitioners and *amici* contend that the Ninth Circuit assumed the data in NVIDIA's sales database "would have shown" the same percentage of mining-related sales as the Prysm analysis. *See* Pet. 3, 21; SEC Comm'rs' Amicus Br. 20. The Ninth Circuit did no such thing. It concluded that NVIDIA's internal reports would have shown that "a large portion of GPU sales" were for mining. App. 42a.

**EX 8**

190

22

alleged that NVIDIA *could* and *did* track sales—allegations the Ninth Circuit properly accepted as true, observing that NVIDIA admitted it "carefully monitors purchases of GPUs from its partners." *See Tellabs*, 551 U.S. at 322; App. 10a, 41a-42a; 3-ER-347-64:¶¶78-81, 83-88, 92-93, 96, 99-104, 107-26. Huang admitted that NVIDIA "monitor[s] sellout in the channel literally every day" (App. 10a, 40a-42a), and FEs reported that Huang reviewed internal data—including the centralized sales database—showing large percentages of mining-related GeForce GPU sales. App. 38a-42a.

### B. Petitioners Manufacture an Illusory Circuit Split

Petitioners contend that five circuits categorically require a plaintiff relying on internal documents to "describe the *actual contents*" of those documents, while two circuits (the First and Ninth) permit a plaintiff to allege only what those documents "*might have shown*." Pet. 15. As discussed *supra*, Plaintiffs in fact described with particularity the contents of NVIDIA's internal reports. Further, the Ninth Circuit did not "deepen" a split as to what is required to plead scienter because none of the cases Petitioners cite actually establishes the categorical rule underlying this purported circuit split.

Circuit courts uniformly reject categorical rules when assessing the adequacy of scienter allegations, adhering instead to the fact-based analyses one would expect of courts reviewing allegations holistically. *See, e.g.*, *Inst'l Invs. Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 272-73 (3d Cir. 2009) (rejecting "categorical rules about the sufficiency of different types of allegations in the abstract" because

**EX 8**

191

23

cases present "different configuration[s] of factual allegations" and "it is the composite" that matters); *Ottmann* v. *Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 345 (4th Cir. 2003) (adopting "flexible, case-specific analysis"); *Helwig* v. *Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir. 2001) (en banc) (in enacting the PSLRA, "Congress was concerned with the quantum, not type, of proof" and "sought a fact-sensitive approach"); *Adams*, 340 F.3d at 1102-03 (court will "apply a common-sense, case-by-case approach").

The "widely cited" and "pathmarking" *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63 (2d Cir. 2001) (Pet. 17, 19-20) did not require allegations detailing the "actual contents" of Scholastic's internal reports. Just the opposite: There, the district court declined to consider plaintiffs' allegations regarding a "monthly Director's Book and other internal reports analyzing trade sales figures" because plaintiffs failed to allege what was in those reports. *In re Scholastic Corp. Sec. Litig.*, 2000 WL 91939, at *12 (S.D.N.Y. Jan. 27, 2000). The Second Circuit reversed, holding that plaintiffs had adequately alleged details concerning the reports' author, "how frequently [they] were prepared and who reviewed them." *Scholastic*, 252 F.3d at 73. Then, although the complaint lacked allegations specifying the actual contents of Scholastics' internal sales reports, the Second Circuit held that it could determine—from allegations detailing reports Scholastic had received from third-party retailers—what would have been included in Scholastic's internally generated sales statistics. *Id.* (complaint provided "indications as to the nature of the reports, because the allegations are immediately preceded and followed by figures" from third-party retailers showing declining sales); *id.* at 70-

**EX 8**

192

24

72 (describing the contents of reports from third-party retailers sent, or made available, to Scholastic). In other words, even if the Ninth Circuit had held that it could infer, from other allegations, what was in NVIDIA's internal reports, that decision was in accordance, not in conflict, with *Scholastic*'s "pathmarking" standard.

In *ABC Arbitrage* (Pet. 18-19), the Fifth Circuit adopted *Scholastic*'s standard—which it described as requiring a plaintiff to "specify[] who prepared internal company reports, how frequently [they] were prepared and who reviewed them," 291 F.3d. at 356, but not, as Petitioners contend, the reports' "specific contents" (Pet. 19)—and held that plaintiffs satisfied *Scholastic* by alleging how frequently reports were prepared, who prepared and received them, and that they generally "convey[ed] information about the Telecom sector … by comparing actual results to budgeted numbers." *ABC Arbitrage*, 291 F.3d at 356-57.

*California Public Employees' Retirement Sys.* v. *Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) (Pet. 18) and *Arazie* v. *Mullane*, 2 F.3d 1456 (7th Cir. 1993) (Pet. 19-20) held allegations were insufficiently particularized without details identifying who authored a report *and* when it was authored *and* who reviewed it *and* what data its conclusions were based on—all details Plaintiffs provided here. *Chubb*, 394 F.3d at 147 (allegation that a memo was sent to a Chubb branch and commercial managers admitting certain policies had "not worked" was conclusory without additional details); *Arazie*, 2 F.3d at 1467 (allegation that internal projections contradicted public statements insufficient where allegations concerning those projections lacked details as to who prepared the projections, when,

**EX 8**

193

25

how firm the numbers were, and whether defendants received it).

Finally, the Tenth Circuit cases Petitioners cite stand only for the unremarkable proposition that allegations concerning internal reports must sufficiently demonstrate that the reports *contradicted* defendants' public statements. *See Anderson* v. *Spirit AeroSystems Holdings, Inc.*, 827 F.3d 1229, 1235-36, 1240-41, 1243 (10th Cir. 2016) (Pet. 16-17) (in case alleging that defendants knew company would lose millions on two large projects, allegations that draft reports identified cost overruns insufficient to support scienter; they did not explain how "overruns on procurement costs" would necessarily result in company taking loss); *Meitav Dash Provident Funds & Pension Ltd.* v. *Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1220-23 (10th Cir. 2023) (Pet. 17) (allegations that low-level employee contributed layoff projections to early drafts did not establish executives knew that Boeing would stop production where final report compiled "various contingencies, including a drop in Boeing's purchases"). Plaintiffs' allegations satisfy this requirement. *See, e.g.*, App. 37a-40a.

## II. THE NINTH CIRCUIT'S CONSIDERATION OF EXPERT ANALYSIS WAS PROPER AND DID NOT CREATE A CIRCUIT SPLIT

The Ninth Circuit's consideration of allegations concerning the Prysm analysis, which were included in the FAC, was appropriate under this Court's precedent and the PSLRA. The Ninth Circuit undertook an extensive review of Prysm's analysis, concluded it was detailed and reliable, and then concluded that the totality of the

**EX 8**

26

allegations in the FAC—including, in addition to the Prysm analysis, the RBC report and reports from former employees, easily satisfied the PSLRA's high pleading standards. Petitioners identify no precedent establishing a bright-line rule proscribing consideration, on a motion to dismiss, of factual, non-conclusory allegations derived from expert analyses; nor would such a rule be consistent with this Court's guidance in *Tellabs* or *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009).

Further, the purported circuit split identified by Petitioners is non-existent. Neither the Second nor Fifth Circuit categorically prohibits consideration of allegations derived from expert analysis at the pleading stage. To the contrary, both circuits consider such analyses when they offer non-conclusory factual, rather than legal, opinions.

### A.   The Ninth Circuit's Falsity Analysis Was Correct

Petitioner argues that the "Ninth Circuit allows plaintiffs to circumvent the PSLRA's particularity requirements by submitting an expert opinion" (Pet. 26-27), but Plaintiffs' reliance on Prysm's analysis—one of multiple ways Plaintiffs satisfied the particularity requirements for pleading falsity—was consistent with, not contrary to, the PSLRA.

1. Pursuant to this Court's guidance and the PSLRA's heightened pleading standards, lower courts review each complaint in its entirety, distinguishing between well-pleaded factual allegations (which are entitled to the presumption of truth), and conclusory allegations (which are not). *Iqbal*, 556 U.S. at 678; *id.* at 685 (FED. R. CIV. P. 8 applies to all civil actions); *see also Tellabs*, 551 U.S.

**EX 8**

195

27

at 322 (court must accept as true factual allegations). That analysis is "context-specific," requiring the "court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Pursuant to the PSLRA, courts assess whether the complaint specifies each allegedly misleading statement, the reasons it is misleading and, if an allegation is made on information and belief, states with particularity all facts on which the belief is formed. *See* 15 U.S.C. § 78u-4(b)(1); *see also* FED. R. CIV. P. 9(b) (requiring a complaint to plead with particularity circumstances constituting fraud).

The Ninth Circuit conducted the review this Court's precedent and the PSLRA require. It thoroughly evaluated Prysm's analysis, concluded it met the PSLRA's particularity requirements (App. 20a-21a), was reliable (App. 20a-23a), and then explained that "the totality of detailed allegations … easily satisfies the PSLRA pleading standard for falsity." App. 46a. As the Ninth Circuit explained, Prysm's analysis was just part of the total mix of particularized information showing falsity:

> In sum, we hold that the combination of the following is sufficient to show, even under the demanding pleading standard of the PSLRA, there is a sufficient likelihood that a very substantial part of NVIDIA's revenues during the Class Period came from sales of GeForce GPUs for crypto mining: (1) the very similar analyses of RBC and Prysm; (2) the statements of FE 1, FE 2, and FE 4; and (3) tahe fact that NVIDIA's earnings collapsed when cryptocurrency prices collapsed and crypto miners quit purchasing NVIDIA's GeForce GPUs.

**EX 8**

196

28

App. 25a; *see also* App. 45a-46a.

Proffering only conclusory arguments, Petitioners and their *amici*[8] contend that the opinion of an "expert retained for litigation purposes is not a 'fact' at all, let alone a particularized fact." Pet. 29. But the Ninth Circuit concluded that Plaintiffs' allegations concerning Prysm's analysis were particularized, and Petitioners' inability to articulate a principled reason why allegations derived from expert analysis are per se not "facts" is unsurprising—it is inconsistent with this Court's instruction that, when assessing pleadings, courts must distinguish between "factual matter" and conclusory arguments, and accept only the former as true. *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555-56 (2007). Under Petitioners' proposed rubric, courts would be required to undertake an additional review that considers the source and wording of factual matter, and jettisons even detailed, non-conclusory factual matter derived from expert analysis. Nothing in the PSLRA or this Court's precedent permits such an approach. *See, e.g., Chubb*, 394 F.3d 147 (the "PSLRA is silent regarding the source of a plaintiff's facts").[9]

---

8. *See, e.g.*, Grundfest Amicus Br. 11 (arguing, without elucidation, that the PSLRA requires pleading of "facts," but an expert opinion is "not a 'fact' of the sort that the PSLRA requires").

9. Courts have long recognized that "opinions" and "facts" are not entirely distinct. *See Vulcan Metals Co.* v. *Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918) ("[a]n opinion is a fact"); *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-85 (2015) (opinion statements affirm the fact that the speaker holds the stated belief, and can contain "embedded statements of fact"). Further, "conclusory" and "opinion" are not synonyms; "conclusory" means "[e]xpressing a factual inference without stating the underlying facts on which

**EX 8**

197

29

**2.** Petitioners ignore that opinions are crucial to the determination of fact. A physician's opinion that a medical condition exists is a means—often, an essential means—of proving a fact. In a complex, highly technical, global business environment, utilizing an expert to confirm or invalidate the factual thesis of a securities fraud complaint is a bona fide, often essential, aspect of the due diligence mandated by the PSLRA. Indeed, it may be required by Rule 11, whose mandates the PSLRA both incorporates and enhances.[10] It makes no sense to interpret § 78u-4(b)(1)-(2) to bar reliance on expert opinion (a prohibition that appears nowhere in the statute) when such reliance can be required to satisfy the Rule 11 scrutiny, and avoid the mandatory sanctions, dictated by § 78u-4(c)(1)-(2).

3. To the extent Petitioners or their *amici* suggest that the allegations derived from Prysm's analysis cannot be considered because the analysis is potentially inadmissible, or without first assessing admissibility pursuant to Fed. R. Evid. 702 (*see* Grundfest Amicus Br.

---

the inference is based." BLACK'S LAW DICTIONARY (11th ed. 2019). Prysm's analysis, as pled, is not conclusory. And "particularity" and "opinion" are not antonyms; "particularity" means "[t]he quality, state, or condition of being both reasonably detailed and exact." *Id.* Prysm's analysis, as pled, is particular.

10.  *See, e.g., Calloway* v. *Marvel Ent. Grp.*, 111 F.R.D. 637, 646-47 (S.D.N.Y. 1986) (failure to consult document expert when alleging forgery was unreasonable, in violation of Rule 11), *aff'd in relevant part*, 854 F.2d 1452 (2d Cir. 1988), *rev'd in part on other grounds sub nom. Pavelic & LeFlore* v. *Marvel Ent. Grp.*, 493 U.S. 120 (1989); *Coastal Transfer Co.* v. *Toyota Motor Sales, USA*, 833 F.2d 208, 212-13 (9th Cir. 1987) (failure to retain expert economist to substantiate antitrust claims until more than two years after filing a complaint was unreasonable, one aspect of plaintiff's violation of Rule 11).

**EX 8**

198

30

13, Atl. Legal Foundation Amicus Br. 7-8), both arguments are wrong.

This Court routinely distinguishes between the standards applicable on motions to dismiss and those applicable in later stages of litigation, and has declined to require—even under the PSLRA's heightened pleading standards—that plaintiffs plead evidence or prove their case at the outset. *See Tellabs*, 551 U.S. at 324 n.5 ("It is improbable that Congress, without so stating, intended courts to test pleadings, unaided by discovery, to determine whether there is 'no genuine issue as to any material fact.'"); *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 49 (2011) ("[w]hether respondents can ultimately prove their allegations" is an "altogether different question" from whether scienter was adequately pleaded); *cf. Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013) (FED. R. CIV. P. 23 "does not set forth a mere pleading standard"; instead, a party "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)").

Consistent with this Court's guidance, complaints routinely rely on—and lower courts routinely consider (without assessing admissibility)—evidence similar to expert analyses, such as analyst reports, newspaper and academic articles, hearsay, and plaintiff's own calculations. *See, e.g.*, *Ricciuti* v. *N.Y.C. Transit Auth.*, 941 F.2d 119, 123-24 (2d Cir. 1991) (reliance on "documents that may eventually be ruled inadmissible" is not grounds for dismissal under Rule 12(b)(6)); *Adams*, 340 F.3d at 1101 ("The PSLRA did not … purport to move up the trial to the pleadings stage"); *Avaya*, 564 F.3d at 263 (considering analyst reports); *In re Cassava Sci., Inc. Sec. Litig.*, 2023 WL 3442087, at *8 & n.7 (W.D. Tex. May 11, 2023) (courts

**EX 8**

199

31

have permitted reliance "on short-seller reports to allege falsity at the motion to dismiss stage"); *Bond* v. *Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 667-68 (M.D. Tenn. 2022) (relying on short-seller report, and explaining that "[t]he PSLRA's heightened pleading standards are still pleading standards—not evidentiary ones—and they should not be misconstrued as an invitation for defendants to 'finess[e] the evidentiary limits of a 12(b)(6) motion'"). Virtually every personal injury action is based on expert opinion as to medical condition, whether or not it is specifically identified.

4. The remainder of Petitioners' objections to the Ninth Circuit's decision are not appropriate for review here (Sup. Ct. R. 10)—they are simply rehashes of arguments raised before, and rejected by, the Ninth Circuit.

Petitioners challenge Prysm's analysis as "speculative" and unsupported by "particularized factual allegations" (Pet. 28-29, 31). "But wishing does not make it so,"[11] and the Ninth Circuit rejected that contention, concluding that the FAC "provided detailed information about Prysm's methodology as well as a particularized recitation of facts upon which Prysm relied." App. 20a-21a; *see also* App. 21a-23a (describing reliability of Prysm's analysis).

Petitioners contend that Prysm's analysis was "the only basis for Plaintiffs' allegation that NVIDIA understated how much of its gaming revenue came from GeForce GPUs to cryptocurrency miners" (Pet. 28-29), but the Ninth Circuit rejected that contention. App. 45a. Nor was the Prysm analysis the only source of "revenue information" (Pet. 28-29). As the Ninth Circuit

_____

11.  *Smith* v. *Bayer Corp.*, 564 U.S. 299, 315 (2011).

**EX 8**

200

32

observed, some revenue information was from Defendants themselves and some from FE 1 and FE 4. App. 46a-47a. Finally, the Prysm analysis relied, in part, on NVIDIA's internal documents (App. 22a), but even if it did not, nothing in the PSLRA requires, as Petitioners suggest (Pet. 28-29), a pre-discovery expert analysis not only to be detailed *but also* to rely on a defendant's internal documents. App. 46a.

**B.   The Ninth Circuit's Consideration Of Expert Analysis Did Not Create A Split**

Petitioners contend that there is a circuit split "with respect to whether a plaintiff can plead falsity based on allegations about the after-the-fact opinion of an expert." Pet. 26-27 (citing *Fin. Acquisition Partners, LP* v. *Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006), and *Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022)). Not so. Neither the Second nor Fifth Circuit categorically prohibits reliance on expert analyses. *Blackwell* and *Bristol-Myers* reflect that the qualitative nature of an expert analysis—including the extent to which it is non-conclusory and provides facts rather than legal conclusions—affects whether it can be considered.

In *Blackwell*, plaintiffs attached to their complaint an expert affidavit conclusorily opining that "no reasonable auditor in Deloitte's position would have failed to issue [a going-concern] qualification." 440 F.3d at 285, 290. The district court "refused to consider the expert's conclusions (opinions)," but considered the "affidavit's 'nonconclusory, factual portions,'" and the question on appeal was whether the court *must* consider the entire expert affidavit pursuant to FED. R. CIV. P. 10. *Id.* at 285; *see also Fin. Acquisition Partners, LP* v. *Blackwell*, 2004

**EX 8**

201

33

WL 2203253, at *19 (N.D. Tex. Sept. 29, 2004) (court will consider "verifiable facts" from expert affidavit included in the complaint). The Fifth Circuit held that "the district court did not abuse its discretion" in considering the "nonconclusory, factual portions" of an expert's analysis, but "refusing to consider the opinions/conclusions in the affidavit," because "[e]ven if *non-opinion* portions of an expert's affidavit constitute an instrument" under FED. R. CIV. P. 10(c), "opinions cannot substitute for facts under the PSLRA." *Blackwell*, 440 F.3d at 285-86.

Petitioners likewise misconstrue the holding in *Bristol-Myers*. In its one-paragraph analysis, the Second Circuit (citing *Blackwell*) acknowledged that a plaintiff may "bolster a complaint by including a nonconclusory opinion to which an expert may potentially testify." *Bristol-Myers*, 28 F.4th at 354. But the Second Circuit declined to credit an expert's conclusion that there was an industry consensus regarding the definition of "strong" protein expression where the expert relied only on sources demonstrating there was no such industry consensus. *Id.* at 350-54.

That neither the Second nor Fifth Circuit has the bright-line rule Petitioners claim is underscored by other cases from those circuits that *do* consider non-conclusory expert analyses in deciding motions to dismiss. *See Barrie* v. *Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005) (considering expert opinion in assessing adequacy of allegations concerning accounting violation); *Pub. Emps.' Ret. Sys.* v. *Amedisys, Inc.*, 769 F.3d 313, 323 & n.3 (5th Cir. 2014) (crediting expert analysis filed in support of reconsideration motion in assessing sufficiency of loss causation allegations), *cert. denied*, 576 U.S. 1055 (2015); *Altimeo Asset Mgmt.* v. *Qihoo 360 Tech. Co.*, 19 F.4th 145,

**EX 8**

202

34

150-51 (2d Cir. 2021) (crediting expert's opinion regarding time necessary to complete corporate transaction, together with news articles regarding potential transaction, in assessing sufficiency of allegations that defendants falsely reported they had no plans to relist company); *Blanchard-Daigle* v. *Geers*, 802 F. App'x 113, 115-16, 119 (5th Cir. 2020) (relying on "non-conclusory, factual portions" of expert report in dismissing complaint).

The Second and Fifth Circuit's analyses are consistent with longstanding Ninth Circuit precedent permitting reliance on non-conclusory, detailed expert analyses. *See, e.g.*, *Nursing Home Pension Fund, Local 144* v. *Oracle Corp.*, 380 F.3d 1226, 1233-34 (9th Cir. 2004) (considering financial expert analysis on motion to dismiss); *Glazer Cap. Mgmt., L.P.* v. *Forescout Tech., Inc.*, 63 F.4th 747, 768 (9th Cir. 2023) (permitting reliance on expert analysis to support allegation that market for cloud computing had shifted); *cf. In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022) (plaintiffs cannot rely on expert's statistical analysis to plead fraud because opinion is "based on questionable assumptions and unexplained reasoning").

## III. THIS CASE IS A POOR VEHICLE FOR RESOLVING THESE ISSUES

1. Petitioners have not presented a case or controversy with respect to either Question Presented. As the foregoing demonstrates, (i) Plaintiffs pleaded with particularity the contents of NVIDIA's internal documents (Question 1), and (ii) Plaintiffs did not "rely[] on an expert opinion to substitute for particularized allegations of fact" (Question 2)—Plaintiffs relied on a detailed expert analysis in addition to other particularized statements of fact.

**EX 8**

203

35

2. Petitioners' contention that reliance on an expert is per se improper was an afterthought. They did not raise it (or Question 2 at all) until they filed their petition for en banc review. The Ninth Circuit did not even directly decide it until that time. This Court should not entertain an issue that was not thoroughly litigated below.

3. Even if Petitioners had managed to identify an actual circuit split with respect to pleading scienter or falsity (they have not), this case presents highly fact-bound issues, making it inappropriate for review. Petitioners attack the Ninth Circuit's reliance on allegations concerning internal reports and the Prysm analysis, but the Ninth Circuit relied on the total mix of allegations— not just internal reports and the Prysm analysis—in holding that the totality of allegations met the pleading requirements of the PSLRA for scienter and falsity. App. 17a-34a, 34a-43a, 45a-48a, 55a.

4. This is a particularly poor vehicle for review given that, with respect to falsity, the Prysm analysis may well be superfluous. The Ninth Circuit concluded that RBC had also conducted a "rigorous" analysis that reached a "nearly identical" conclusion as Prysm. App. 46a. Petitioners may disagree with the Ninth Circuit's conclusion that RBC's analysis was "rigorous," but they do not contend that a *per se* rule precludes published reports like RBC's from being considered.

5. Petitioners proffer a series of policy reasons why their petition should be granted (Pet. 32-33), but their insistence that expert analysis cannot be considered on a motion to dismiss amounts to a request that this Court deviate from longstanding principles governing review of motions to dismiss, *supra* §II(A), and "courts should

**EX 8**

204

36

generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns." *Jones* v. *Bock*, 549 U.S. 199, 212 (2007).

Petitioners' prediction that the Ninth Circuit's decision will result in a rash of plaintiffs using expert reports to "circumvent" the PSLRA is belied by the fact that the lower courts have permitted reliance on non-conclusory expert analysis for two decades, yet the dire consequences predicted by Petitioners have not occurred.

Further, the Ninth Circuit's approach does not, contrary to Petitioners' contention (Pet. 32-33), thwart Congress's goals in enacting the PSLRA. The PSLRA's reforms were aimed at ensuring that plaintiffs and their attorneys conducted adequate pre-filing due diligence. *See, e.g.*, S. Rep. No. 104-98, at 8 (1995) (complaint "can be filed with little or no due diligence."); *see also Ackerman* v. *Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (the heightened pleading requirement for fraud is intended "to force the plaintiff to do more than the usual investigation before filing his complaint"). Retaining an expert to confirm or invalidate witness and analyst reports is consistent with, not counter to, Congress's desire to increase pre-filing due diligence. Indeed, in other contexts, such as the medical malpractice context, plaintiffs are often *required* to consult with experts prior to filing a complaint. *See, e.g.*, Del. Code Ann. tit. 18, § 6853 (requiring "affidavit of merit" to be filed with complaint in medical malpractice cases); Conn. Gen. Stat. Ann. § 52-190a (to establish good faith basis for complaint, attorney or complainant must obtain opinion of health care provider opining that there is evidence of medical negligence).

EX 8

205

37

## CONCLUSION

The petition for a writ of certiorari should be denied.

Respectfully submitted,

MATTHEW L. MUSTOKOFF
ANDREW L. ZIVITZ
KESSLER TOPAZ MELTZER
  & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087

STACEY M. KAPLAN
KESSLER TOPAZ MELTZER
  & CHECK, LLP
One Sansome Street,
  Suite 1850
San Francisco, CA 94104

GREGORY P. JOSEPH
  *Counsel of Record*
RACHEL M. CHERINGTON
COURTNEY A. SOLOMON
JOSEPH HAGE AARONSON, LLC
800 Third Avenue, 30th Floor
New York, NY 10022
(212) 407-1200
gjoseph@jhany.com

JOHN RIZIO-HAMILTON
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1251 Avenue of the Americas,
  44th Floor
New York, NY 10020

JONATHAN D. USLANER
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
2121 Avenue of the Stars,
  Suite 2575
Los Angeles, CA 90067

*Counsel for Respondents*

**EX 8**

206